[No. B072915. Second Dist., Div. Three. June 22, 1995.]

RESORT VIDEO, LTD., Plaintiff and Appellant, v.
LASER VIDEO, INC., Defendant and Appellant.

## COUNSEL

Paul M. Hittelman for Plaintiff and Appellant.

McCutchen, Doyle, Brown & Enersen, John R. Reese, John C. Morrissey and Robert A. Brundage for Defendant and Appellant.

## OPINION

**KITCHING, J.**—This appeal involves a procedural attack on the trial court's decision to grant a new trial motion and concerns the sufficiency of evidence to support an award of damages. The matter arises from a breach of contract action for the purchase and sale of replicated video discs. The issue is not whether damages should have been awarded, but whether the amount of the award was excessive.

Plaintiff, appellant, and cross-respondent Resort Video, Ltd. (Resort) appeals from the order of the trial court granting defendant, respondent, and cross-appellant Laser Video, Inc. (Laser) a new trial on the issue of damages.

Laser cross-appeals from the judgment entered following a jury verdict awarding Resort damages in the sum of $975,000.

On the appeal, Resort argues the trial court failed to comply with the requirements of Code of Civil Procedure section 657, and, even with

compliance, there was sufficient evidence to support the jury's $975,000 verdict.[1]

We find the trial court's order properly stated the grounds for granting Laser a new trial, and the specification of reasons was adequate and timely filed. We further find evidence of lost profits and business expenses proffered by Resort at trial was insufficient to support the $975,000 verdict. The trial court did not abuse its discretion. Accordingly, we affirm.

Considering our ruling, we need not address the argument in Laser's cross-appeal that there was insufficient evidence to support the damage award.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1983, John Brink (Brink) formed Resort for the purpose of producing resort promotional materials, to wit, video presentations of vacation hotels on laser discs, for use in travel agencies. The business utilized a system of barter, exchanging goods and services in lieu of cash. Hotels would provide Resort $10,000 worth of room credits in exchange for participation in this advertising program. Resort would exchange the credits for the filming, editing and production of the discs. Films of the hotels would be converted to video discs, which were to be distributed to participating travel agencies through a network of territorial representatives (reps). Each rep would purchase or lease video equipment which he or she would then rent to the 100 travel agencies signed on in his or her area. Travel agencies would, in turn, make the video discs available to their clients and attempt to sell to them the remaining resort credits.

By mid-1985, Resort completed the first stage of its development program by signing agreements with 33 Caribbean resorts, filming the hotels and preparing video discs. The 3M Company manufactured these Caribbean discs, but accepted only cash, not resort credits. The cost was $13 per disc. To expand its video library, Resort then signed agreements with 46 Mexican resorts and filmed the hotels. However, instead of using 3M Company to manufacture the Mexican video discs, Resort looked for a production source that would accept resort credits. Laser agreed. At the same time, Resort started to develop its rep program.

In or around August 1986, Resort and Laser entered into an agreement for the production of video discs. Resort advised Laser of its video disc program and the immediate need for the materials to be placed with travel agencies

---

[1]Unless otherwise indicated, all references are to the Code of Civil Procedure.

for the upcoming resort season. By September 18, 1986, Laser satisfactorily completed six master discs. In October 1986, Resort ordered 300 replicated discs from each master disc, to be delivered "as soon as possible." Despite Resort's repeated calls and requests for the discs, Laser made only a partial delivery in mid-December. The late delivered discs were of varying and unpredictable quality and could not be delivered to the reps for distribution to the travel agencies. With the unavailability of the Mexican discs, the reps withdrew or postponed their commitment to the program, Resort missed the resort season and the business closed.

On December 15, 1989, Resort filed a complaint for damages against Laser alleging causes of action for fraud, breach of contract, and negligent misrepresentation.[2] The gravamen of the complaint was that Laser's failure to timely deliver quality replicated Mexican video discs destroyed Resort's business.

The trial began August 17, 1992. Prior to testimony, the trial court heard argument on Laser's motion *in limine* to exclude Resort's evidence of damages of lost profits and prior investments. The court excluded evidence of speculation or predictions of future profits, and granted Laser's motion as to prior investments, stating: "There's a difference between prior investment and the worth of an asset. If you can show an asset was lost due to the profit, then you can recover the value of that asset. But the fact that somebody invested $100,000 into a car, at the time the car is lost it is only worth $500, $500 is your loss, not the amount of money that was invested. So the amount of investments would be excluded." The court further ruled Resort could present evidence to show the causal effect of Laser's actions on the loss of its business, and the worth of that business.

Brink provided the only evidence to support Resort's claim for damages.[3] He testified that prior to 1983 he had no experience in the travel business, but became interested in the concept of placing laser video presentations of resorts in travel agencies after learning of the successful use of the video presentations in the automotive industry. The business would make money through the accumulation of resort credits and the use of the reps.

[2]At trial, after both sides had rested, Laser moved for a directed verdict on causes of action for fraud and negligent misrepresentation, which the court granted on statute of limitation grounds. The matter went to the jury only on the cause of action for breach of contract and the issue of damages.

[3]The court granted Laser's new trial motion on the ground of excessive damages. The only evidence of damages in the record was Brink's testimony. The trial exhibits were not made part of the record on appeal. Accordingly, we review Brink's testimony to determine the sufficiency of evidence to support the jury's award. The determination by the jury that Laser breached its agreement with Resort is not an issue on appeal.

The first year of the program, Brink testified, Resort entered into written agreements with 33 Caribbean resorts. Each hotel agreed to issue $10,000 worth of room credits in exchange for program participation, for a total of $330,000 in credits. The second year, Resort signed agreements with 46 Mexican resorts. Each hotel agreed to issue $10,000 worth of room credits, for a total of $460,000 in credits. The travel agents, in booking vacations, would sell clients the resort credits. The travel agent would retain 20 percent of the charged cost, the rep would receive 20 percent, and Resort would receive the remaining 60 percent of those moneys. Brink further testified out of $790,000 in resort credits, $370,000 were used in barter, leaving $390,000 in unused credits. Accordingly, this would have yielded Resort a net revenue of $234,000.

However, Brink testified, there were restrictions on use of the credits: they could not be used during the resort season, January through April, they could only be used for hotel rooms, and they were only available for 18 months from the date the hotel signed the agreement with Resort.

Brink further testified that according to the agreements with the Caribbean hotels, the $10,000 room credits were not immediately available, but would be issued to Resort in 4 stages: the first $2,500 payment in credits when the video was completed; the second $2,500 payment in credits when the program "signed" 500 travel agencies; the third $2,500 payment in credits when the program "signed" 1,000 travel agencies; and the fourth $2,500 payment in credits when the program "signed" 1,500 travel agencies. Resort's program never even signed 100 travel agencies and, according to the hotel agreements, Resort was only entitled to one-fourth, or $82,500 worth of credits. However, Brink testified, Resort subsequently changed its philosophy and developed a new concept that attempted to utilize larger agencies with $10 million in yearly sales and, therefore, was entitled to all of the credits. Resort neither formally advised the hotels of this change nor modified their existing agreements. Instead, Resort put the information in its newsletter. There was really no need to contact the hotels and request more than the $2,500 payment in credits, Brink testified, because the credits were not being redeemed and there was no demand.

Brink further testified the Mexican resorts had similar restrictions in their agreements on the "payment" of the credits: 25 percent of the accommodation credit available upon completion of the filming; 25 percent of the accommodation credit available upon completion of the video; and 50 percent of the accommodation credit available when the program "signed" 1,000 travel agencies with video equipment. Resort did not have the allotted 1,000 travel agencies to meet the Mexican agreement requirement, but,

Brink testified, Resort "had the requirement to satisfy the volume that was necessary to substitute the travel agency for volume." Resort unilaterally changed the travel agency requirement with the hotels. As with the Caribbean credits, nothing was done with these resort credits.

Brink further testified, after completing the Caribbean disc, and while developing the Mexican disc, Resort began developing a network of reps. Brink contacted individuals and travel agencies with his idea of using 14 reps to serve 1,600 travel agencies across the country. Each rep would initially invest $100,000 in video equipment ($1,000 per unit) that would be placed in each of the 100 travel agencies in his or her area. Each travel agency would pay a $25 monthly equipment rental fee, plus the cost of the disc. Resort would receive $3 from each rental fee, and a $200 commission for each video unit placed with the agency. Accordingly, each rep signified a $20,000 commission to Resort.

Brink further testified Resort had six signed rep contracts, and tentative commitments, but no signatures, from four more individuals. Additionally, one of the travel agencies assured Brink it would provide Resort's full complement of reps. Therefore, Brink theorized, Resort would have made $280,000 from its reps. However, Brink testified he learned the reps were borrowing video equipment from each other rather than purchasing the units as required by the contract.

Brink further testified Resort had incurred expenses in the operation of its business, which included: $370,000 extended in barter for goods and services acquired in preparation of the Caribbean and Mexican discs; a third party's $250,000 investment in the business; overhead of $9,000 a month; and deferred salaries for himself ($60,000) and his son ($40,000-$50,000). Additionally, Brink testified, while sales efforts were not complete, he made arrangements for film presentations of approximately 60 Hawaiian resorts, and talked to approximately 20 of the island hotels about joining the program. He additionally prepurchased film presentations of resorts in Jamaica and in the Bahamas, but did not conduct any in-depth marketing to determine the hotels' interest in Resort's program.

Brink further testified in 1986 he considered various companies to produce the Mexican laser discs, including 3M. However, he decided to follow up on a referral to Laser. In 1984 and 1985 Laser had not fully developed its procedure for replicating large numbers of discs. Therefore, in 1985, and in May 1986, Resort used 3M to replicate the Caribbean discs, and the company was available to replicate the Mexican disc. 3M was "up and running" with its replication process and had promptly produced the Caribbean tapes.

Resort elected to use Laser, however, "because they agreed to go the barter route." However, 3M was available to replicate the Mexican discs through the end of 1986 and the beginning of 1987. Brink further testified he knew in November 1986, after Laser repeatedly delayed the order, Resort was not going to timely receive the Mexican discs. Brink did not, however, turn to 3M or any other vendor. He relied on Laser's assurances that the discs would be shipped "tomorrow," and besides Brink testified, going to another company may have presented bigger problems.

After both sides rested counsel presented argument. The jury was instructed on, in relevant part, the burden of the parties, the measure of damages (BAJI No. 10.90), general damages for loss of profits (BAJI No. 10.91), special damages for breach of contract (BAJI No. 10.92), speculative damages, and mitigation.

After deliberation, the jury returned a verdict in favor of Resort and awarded damages in the sum of $975,000. Judgment was entered on August 25, 1992.

On September 9, 1992, Laser filed a notice of intention to move for a new trial, on grounds, among others, of excessive damages and insufficiency of the evidence. (§ 657, subds. 5 and 6.)

In a motion filed September 24, 1992, Laser contended the $975,000 damage award was excessive because Resort was a new enterprise and its claims of lost profits for an unestablished business were either speculative, not supported by the evidence, or not recoverable. Additionally, Laser argued, Resort failed to mitigate its damages after becoming aware the Mexican discs were not going to be timely delivered.

In opposition, Resort argued there was sufficient evidence of future profits from the reps and from the unused resort credits, and of damages from the loss of an ongoing business to support the jury award. Resort further argued Laser failed to meet its burden of establishing that Resort failed to mitigate its damages. Resort reasonably relied on Laser's assurances the discs would be delivered and there was no evidence presented of a then available alternative source for the discs.

On October 23, 1992, the trial court granted Laser's motion for a new trial and issued a minute order stating "that there was insufficient evidence produced at trial to justify the excessive damages awarded by the jury."

On October 29, 1992, the trial court filed its specification of reasons:

"Pursuant to [Code Civ. Proc., § 657, subds. 5. and 6.], the Court herein states its specific reasons for granting the motion for new trial, as follows:

"1. There was insufficient evidence as to lost profits; any evidence of prospective orders or demand was speculative.

"There was no evidence of prior history of profits for this business, or any similar business. Any award for lost profits could only have been based on pure speculation.

"2. There was insufficient evidence as to the value of the business. The only proffered evidence was as to investment in, and expenses of, the business. There was no specific credible evidence as to the value of the business.

"3. The only reliable evidence of damage that was offered, was evidence of the value of the product that was contracted for, but not produced; and that amount was less than one-thirtieth [1/30] of the jury's award (less than $30,000.00)."

On December 15, 1992, Resort filed a notice of appeal. On January 4, 1993, Laser filed a notice of cross-appeal.

## CONTENTIONS

Resort contends the trial court abused its discretion by granting Laser's motion because: (1) the trial court's new trial order was procedurally defective; (2) the damage award was not excessive; and, (3) there was sufficient evidence of recoverable lost profits and damages to support the award.

## DISCUSSION

### 1. *Standard of Review*

■ " 'In reviewing the order granting a new trial, we apply the following rule: "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside. [Citations.]"

[Citation.] [¶] ". . . The presumptions on appeal are in favor of the order, and the appellate court does not independently redetermine the question whether an error was prejudicial, or some other ground was compelling. Review is limited to the inquiry whether there was any support for the trial judge's ruling, and the order will be reversed only on a strong affirmative showing of abuse of discretion. [Citations.]" [Citation.]' [Citation.]" (*Romero* v. *Riggs* (1994) 24 Cal.App.4th 117, 121-122 [29 Cal.Rptr.2d 219].)

### 2. *The Trial Court Complied With the Statutory Requirements of Section 657*

In a procedural attack on the court's new trial order, Resort contends the trial court failed to specify the ground upon which it based its ruling, and that the specification of reasons was inadequate and untimely filed. The contention is without merit.

In considering a new trial motion, the court must follow the statutory requirements of sections 657 and 660.

Section 657 authorizes a trial court to grant a new trial "on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party:

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"5. Excessive or inadequate damages.

"6. Insufficiency of the evidence to justify the verdict or other decision, . . . .

"7. . . . . [¶] When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"*The order* passing upon and determining the motion must be made and entered as provided in Section 660 and if the motion is granted *must state the ground or grounds relied upon by the court*, and *may contain the specification of reasons. If* an *order* granting such motion *does not contain such specification of reasons, the court must, within 10 days after filing such order*, prepare, sign and *file such specification of reasons* in writing with the clerk." (Italics added.)

Section 660 provides, in relevant part, "the *power of the court* to rule on a motion for a new trial shall expire *60 days* from and after the mailing of notice of entry of judgment by the clerk . . . or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial." (Italics added.)

With these statutory requirements in mind, we consider Resort's arguments.

### a. *The Order Adequately Stated the Grounds*

■ First, Resort argues the October 23, 1992, order granting a new trial is defective because it contained two statutory grounds, insufficiency of evidence and excessive damages, and it is unclear on which ground the court relied in granting the motion. We disagree.

This division addressed that issue in *Kolar* v. *County of Los Angeles* (1976) 54 Cal.App.3d 873 [127 Cal.Rptr. 15] and stated: "While plaintiffs suggest the contrary, we construe the order to grant a new trial on the issue of damages alone upon the ground of excessive damages and the reference to the additional ground of insufficiency of the evidence to simply elaborate thereon rather than to compel the conclusion that the new trial was granted on both the issue of liability as well as damages. In *Stevens* v. *Parke, Davis & Co.*, [(1973)], 9 Cal.3d 51, 59-60 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059], we find the following appropriate comment in footnote 10: 'Although the order also states that the verdict "is not sustained by the evidence" we do not deem it necessary to treat it as having granted the new trial on the additional ground of "[i]nsufficiency of the evidence to justify the verdict" as specified in subdivision 6 of section 657. A finding that the damages were excessive necessarily implies that the evidence did not justify the award. [Citations.] . . . Therefore, we have construed the new trial order in this case to be based solely on the ground of excessiveness of damages.' " (*Id.* at pp. 877-878; see also *Sanchez* v. *Hasencamp* (1980) 107 Cal.App.3d 935, 939 [166 Cal.Rptr. 118].)

A clear reading of the October 23, 1992, order supports the conclusion the rationale in *Kolar* is applicable in our case. "[T]he ground for a new trial is adequately specified if the intention of the court is clear. [Citation.]" (*Jones* v. *Citrus Motors Ontario, Inc.* (1973) 8 Cal.3d 706, 710 [106 Cal.Rptr. 28, 505 P.2d 220].) There can be no doubt the ground upon which the trial court relied was that of excessive damages.

### b. *The Specification of Reasons Was Timely Filed*

■ Second, Resort argues the trial court was required to file its specification of reasons within the 60-day jurisdictional limit mandated by section 660 and relies on *Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892 [215 Cal.Rptr. 679, 701 P.2d 826] to support its position. However, Resort's reliance is misplaced.

In *Sanchez-Corea*, the trial court granted defendant's motion for a new trial on the 60th day after notice of entry of judgment was mailed, but failed to specify any grounds in the order. (38 Cal.3d at p. 898.) Sixty-seven days after notice of entry of judgment, the trial court filed an order specifying both the grounds and the reasons for granting the new trial motion. (*Id.* at p. 901.) Our Supreme Court determined the order defective since "the trial court's attempt, after expiration of the 60-day period allowed by section 660, to state insufficiency of the evidence as the ground for ordering a new trial was ineffective as an act in excess of jurisdiction." (*Id.* at p. 905.) The court reasoned "[s]ection 657 clearly distinguishes between grounds and reasons. If the motion for new trial is granted the order 'must state the ground or grounds relied upon by the court' and 'may contain the specification of reasons.' If the initial order does not contain the specification of reasons, then the court must prepare, sign and file such specification within 10 days. There is no indication in section 657 that any grounds for ordering a new trial may be initially set forth by the trial court during that 10-day period. [¶] . . . The statute clearly allows only grounds to be stated in the initial order, and only reasons to be stated within 10 days thereafter." (*Id.* at p. 902.)

However, we can factually distinguish *Sanchez-Corea* because, in our case the trial court did file an order within the 60-day jurisdictional limit stating the ground for granting the new trial. The record reflects Resort personally served notice of entry of judgment on August 26, 1992, and Laser filed its intention to move for a new trial on September 9, 1992. The trial court had until October 27, 1992 to rule on the motion. On October 23, 1992, the trial court issued an order granting the new trial motion on the ground of excessive damages. Six days later, on October 29, 1992, the trial court filed a separate specification of reasons.

The issue then becomes whether the 10-day statutory period in which to file a specification of reasons is included within the 60-day statutory period under section 660, or is in addition to that period of time. We find *Fortenberry* v. *Weber* (1971) 18 Cal.App.3d 213 [95 Cal.Rptr. 834] decisive in this matter. The *Fortenberry* court stated:

"Initially, it should be noted that one court, in dicta, has observed that 'perhaps' the period is 'limited to the 60-day period, after service of notice

of entry of judgment, which . . . section 660 allows for the court to pass upon a motion for new trial.' (*Swanson* v. *Western Greyhound Lines, Inc.*, 268 Cal.App.2d 758, 760 . . . .) Yet it is also true a statute must be given a reasonable and practical construction [citations], and there is a constitutional and statutory mandate to disregard at every stage of an action procedural error which does not affect the substantial rights of the parties. [Citations.]

"The very language of section 657 provides the reasons must be stated within 10 days *after granting the motion* and the language has been so interpreted. (See *Mercer* v. *Perez* [(1968) 68 Cal.2d 104] at p. 121 [65 Cal.Rptr. 315, 436 p.2d 315].) Moreover, one court has noted, 'It would be unreasonable . . . to construe section 657 as compelling the judge to set forth his "examination of the entire cause, including the evidence," on the face of the new trial order itself.' [Citation.] Section 657 provides the order '*may* contain the specification of reasons.' . . . There is no statutory obligation that the order in fact contain the reasons. The specification of reasons is totally distinct from the order.

"As we read section 657 . . . the statutory period of 10 days may be in addition to the period provided for in section 660, but the 10-day period commences to run with the filing of the order granting the motion for new trial. If the trial judge is allowed the full 60-day period in which to make his order, and if the order need not contain the specification of reasons, the trial judge should be allowed not more than 10 days after the order was filed in which to clearly set forth his reasons in writing. If it were the intent of the sections to include the 10 days within the 60-day period, the sections could easily so have provided." (*Fortenberry* v. *Weber, supra*, 18 Cal.App.3d at p. 221.)

The rationale of *Fortenberry* was reinforced by our Supreme Court in *Sanchez-Corea* v. *Bank of America, supra*, 38 Cal.3d 892, when it stated: "While the [new trial] order passing upon and determining the motion '*must* state the ground or grounds relied upon by the court,' the order '*may* contain the specification of reasons.' (Italics added.) If the order stating the grounds does not also specify the reasons for the new trial, then 'the court must, within 10 days after filing such order, prepare, sign and file such specification of reasons in writing with the clerk.' Thus, under section 657, the grounds for the new trial must be stated in the order. The reasons may also be stated in the order, but the trial court has the option of filing a statement of the reasons at a later time." (*Id.* at p. 899.)

Accordingly, the filing of the trial court's specification of reasons, within 10 days after the order granting Laser a new trial, was timely. We now consider the adequacy of the specification of reasons.

### c. The Specification of Reasons Was Adequate

■ Finally, Resort argues the specification of reasons was inadequate because the trial court failed to identify the deficiency of evidence in the record and merely stated ultimate facts. We disagree with this technical argument because reasons were clearly stated and were sufficient to apprise Resort and this court why the trial court considered the jury award excessive. (See *Kolar* v. *County of Los Angeles, supra,* 54 Cal.3d at p. 879.)

In *Mercer* v. *Perez* (1968) 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315], our Supreme Court explained that the purpose of the specification of reasons was to promote careful deliberation by the trial court and afford the parties the right of meaningful appellate review. (*Id.* at pp. 113, 115.) As to the sufficiency of such specifications, the *Mercer* court stated, "it will be sufficient if the judge who grants a new trial furnishes a concise but clear statement of the reasons why he finds one or more of the grounds of the motion to be applicable to the case before him. No hard and fast rule can be laid down as to the content of such a specification, and it will necessarily vary according to the facts and circumstances of each case." (*Id.* at p. 115.) If the trial court relied on the ground of insufficiency of the evidence, *Mercer* required the specification of reasons to "briefly identify the portion of the record which convinces the judge 'that the court or jury clearly should have reached a different verdict or decision.'" (*Id.* at p. 116.)[4]

In our case, the trial court reasoned in its October 29, 1992, order that when the only credible evidence of damages presented by Resort was of the approximate $30,000 value of the discs it did not receive, the jury most likely considered speculative evidence of lost profits and insufficient evidence of valuation of the business to award Resort $975,000. Since Brink, through his testimony and identification of documents, provided the only damage evidence in this trial, it was obvious the evidence and portions of the record referred to by the trial court regarding lost profits, valuation of the business and costs for the discs related to Brink's testimony.

While Resort "would have us declare the order inadequate because it fails to make specific reference to the record specifying wherein the evidence is insufficient to support the amount of damages awarded[,] [t]here is no requirement that such reference to the record must be made." (*Kolar* v. *County of Los Angeles, supra,* 54 Cal.App.3d at p. 879.) In *Scala* v. *Jerry*

---

[4]In *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 60, footnote 10 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059], our Supreme Court decided ". . . the same rules regarding specification of reasons apply to both excessiveness of damages and insufficiency of the evidence to support the verdict insofar as it awards damages." (See also *Kolar* v. *County of Los Angeles, supra,* 54 Cal.App.3d at p. 878.)

*Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 370 [90 Cal.Rptr. 592, 475 P.2d 864], our Supreme Court stated "that to comply with section 657 'the trial judge is not necessarily required to cite page and line of the record, or discuss the testimony of particular witnesses,' nor need he undertake 'a discussion of the weight to be given, and the inferences to be drawn from each item of evidence supporting, or impeaching, the judgment.' [Citation.] On the other hand, he must do more than in effect reiterate the ground of his ruling." In our case, Resort and this court are directed to Brink's testimony which directly bears on the issues raised in the specification of reasons. "There is no need to rummage through the entire record seeking evidence on which the trial court may have relied. The opportunity for meaningful appellate review is afforded and has been accomplished." (*Sanchez* v. *Hasencamp, supra,* 107 Cal.App.3d at p. 942.)

While Resort contends the trial court's reasons are actually impermissible ultimate facts, it is clear that the reasons the damages were considered excessive pertain specifically to evidence, or lack thereof, of prospective orders and demand, Resort's lost profits, profits of comparable businesses, investment expenses, and the value of the discs. If the trial court only stated that damages were excessive or evidence was insufficient, without more, then Resort would be correct. However, a reading of the court's order clearly shows that was not the case. The court went beyond merely reiterating the ground upon which it based its decision to grant a new trial.

We conclude "the trial court's stated reasons for granting the new trial more than adequately 'directs the appellate court's attention' to the aspects of the record which support the order; . . . . No more is reasonably or sensibly to be required of a trial court." (*Romero* v. *Riggs, supra,* 24 Cal.App.4th at p. 124.)

### 3. *There Was Insufficient Evidence to Justify the $975,000 Damage Award*

■ Determining the trial court complied with the requirements of section 657, we next consider the damage award. Resort contends there was sufficient evidence of lost profits and recoverable damages to support the jury's award. We disagree.

#### a. *Measure of Damages*

In a breach of contract action, "the measure of damages, . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.)

■ "It is often said that damages must be 'foreseeable' to be recoverable for breach of contract. The seminal case announcing this doctrine, still generally accepted as a limitation on damages recoverable for breach of contract, is *Hadley* v. *Baxendale* (1854) 156 Eng.Rep. 145. First, general damages are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach. Second, if special circumstances caused some unusual injury, special damages are not recoverable therefor unless the circumstances were known or should have been known to the breaching party at the time he entered into the contract." (*Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455-456 [277 Cal.Rptr. 40].)

■ "The basic measure of damages for a seller's nondelivery or repudiation is the difference between the market price and the contract price. [Citation.] The market price to be used as the basis of the calculation is the market to which the buyer would normally go to effect cover. [Citations.] Market price is measured as of the time the buyer learned of the breach . . . at which time he could be expected to seek cover. [Citation.]" (*Sun-Maid Raisin Growers* v. *Victor Packing Co.* (1983) 146 Cal.App.3d 787, 790 [194 Cal.Rptr. 612], fn. omitted.)

"In addition to the difference between the market price and the contract price, the buyer can recover incidental damages such as expenses of cover [citation] and consequential damages such as lost profits [citation] to the extent they could not have been avoided by cover. The inability to cover after a prompt and reasonable effort to do so is a prerequisite to recovery of consequential damages. [Citation.]" (*Sun-Maid Raisin Growers* v. *Victor Packing Co., supra*, 146 Cal.App.3d at p. 791.) "Finally, a buyer's failure to take any other steps by which the loss could reasonably have been prevented bars him from recovering consequential damages. [Citation.]" (*Id.* at p. 792.)

Considering these legal premises, we determine if there was any support for the trial court's order.

b. *Lost Profits*

■ The trial court stated: "There was insufficient evidence as to lost profits; any evidence of prospective orders or demand was speculative. [¶] There was no evidence of prior history of profits for this business, or any similar business. Any award for lost profits could only have been based on pure speculation."

■ "Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once

their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.]" (*Berge* v. *International Harvester Co.* (1983) 142 Cal.App.3d 152, 161-162 [190 Cal.Rptr. 815].) However, "[i]t has been frequently stated that if a business is new, it is improper to award damages for loss of profits because absence of income and expense experience renders anticipated profits too speculative to meet the legal standard of reasonable certainty necessary to support an award of such damage. [Citations.] However, the rule is not a hard and fast one and loss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof. [Citations.] In the present case the question is whether the evidence of loss of prospective profits meets that standard." (*Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists* (1971) 14 Cal.App.3d 209, 221 [92 Cal.Rptr. 111].) Unestablished businesses have been permitted to claim lost profit damages in situations where owners have experience in the business they are seeking to establish, and where the business is in an established market. (*A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 494 [186 Cal.Rptr. 114, 38 A.L.R.4th 1]; *S. Jon Kreedman & Co.* v. *Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173, 184-185 [130 Cal.Rptr 41].)

 The record reflects Resort was a newly established business without a financial track record. When Brink developed Resort in 1983, he had no prior experience in either the video disc or travel business. Resort operated pursuant to a barter arrangement and ran on the concept of "resort credits," which were used as cash. Resort was issued $790,000 in resort credits. It received goods and services "valued" at $370,000 in exchange for these credits, and retained $390,000 worth of unused credits. While Resort was to receive 60 percent of the moneys paid travel agencies for the purchase of those credits, to wit $234,000, there was no evidence any of the credits had ever been sold or that Resort received any profit from their sale. There was evidence that none of the credits had ever been redeemed because there was no demand for them. We can therefore assume that without any demand, the credits had no value. Even though Resort's difficulties seemed to occur because of the problems with the Mexican disc, there was no evidence of any moneys or profits made as a result of the "marketing" of the Caribbean disc.

The record further reflects Resort utilized a network of reps to "sell" the laser disc presentations to 100 travel agencies in each of their areas. Each rep was, based on the required investment and purchase of video equipment, theoretically worth $20,000 in profit for Resort. However, Resort only signed six reps, though it may have had commitments from other individuals. There was no evidence as to the extent of those commitments other than

the testimony of Brink himself. Additionally, there was evidence the reps never purchased the video equipment, but instead, shared the machines, which would have reduced the amount of Resort's profit. There was no competent evidence to support Brink's claim he could have had 14 reps which would have netted the company $280,000. Additionally, the only evidence produced to explain why the reps withdrew from the program came from Brink's testimony. The trial court determined more evidence was needed. There was no evidence from the reps to show their effect on the program (in fact, the reps had not been hired until after the Caribbean discs were completed), expenses incurred or profits made, or that they withdrew from the program because of the Mexican disc problem. In fact, none of the reps testified or provided any documentation to support Brink's statements of how he lost these "profit centers."

Brink also testified that, even though the island hotels had not been signed, he had talked to approximately 20 Hawaiian resorts about their participation in the program. Sales efforts were incomplete, however, and there was no evidence these resorts would have afforded Resort any opportunity for profit. In addition, Brink had purchased pre-filmed presentations of other Caribbean resorts from a Canadian company that previously attempted to "sell" this promotional idea to travel agencies. There was no evidence regarding the financials of this comparable business. There was no evidence these resorts would have joined Resort's program because Brink had not conducted any in-depth marketing surveys regarding these potential sources of income.

Brink never introduced into evidence any of the business's profit-and-loss statements, balance sheets, ledgers, or any other documents to show Resort's profits or worth. There was no expert testimony. Brink never provided evidence of the business's profits and losses in regard to the Caribbean venture. Brink even testified that by the end of 1986 he did not know how well his program worked because the concept had not even been tested for a full year.

This evidence fails to provide that degree of reasonable certainty necessary to support an award for lost anticipated profits. The business was new. Brink was unable to either produce any evidence of an operating history of this venture or introduce any evidence of operating histories of comparable businesses. Brink expressed his opinion Resort "would have" signed its complement of reps and "would have" reaped income from the Mexican resorts and "would have" signed additional hotels "but for" the unavailability of the Mexican video. However, with Brink's lack of prior experience in the business and his failure to produce the required evidence, it was speculative and conjectural whether Resort "would have" generated the business that "would have" allowed it to lay claim to any lost profits.

Even if Resort was able to provide credible evidence of lost profits, it must be remembered that "[w]hen loss of anticipated profits is an element of damages, it means net and not gross profits. [Citations.] . . . '. . . . Net profits are the gains made from sales "after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed." [Citation.]' " (*Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists, supra,* 14 Cal.App.3d at pp. 222-223.) From this record, the evidence, at the most, may have shown the possibility of loss of gross revenue, not the loss of any net pecuniary gain. (*Ibid.*)

### c. Value of the Business

The trial court stated: "There was insufficient evidence as to the value of the business. The only proffered evidence was as to investment in, and expenses of, the business. There was no specific credible evidence as to the value of the business."

 "The opinion of an owner of personal property is in itself competent evidence of the value of that property, and sufficient to support a judgment based on that value. [Citations.] 'The credit and weight to be given such evidence and its effect . . . is for the trier of fact.' [Citation.]" (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921 [114 Cal.Rptr. 622, 523 P.2d 662].) "Evidence of cost, uncontradicted by other evidence, is sufficient to support a finding of value. [Citations.]" (*Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists, supra,* 14 Cal.App.3d at p. 218.) In *Gerwin,* a specific performance action regarding the breach of an agreement for the sale of restaurant and bar equipment, plaintiff testified without contradiction, that, having previously owned bars, he was familiar with the cost of obtaining replacement equipment. (*Id.* at p. 218.) Witness testimony regarding the market value of new equipment, and photographs were received into evidence to show the quality of furnishings. (*Ibid.*) This evidence proved sufficient proof of the value of the business to support a damage award. (*Ibid.*) That is not our case.

The record reflects Brink never provided evidence of cost, but only testified as to the *expenses* incurred in operating the company. He claimed an overhead of $9,000 a month, deferred salaries for himself ($60,000) and his son ($40,000 to 50,000), and a $250,000 investment in the business. Brink also claimed $370,000 extended in barter for goods and services acquired in preparation of the Caribbean discs. However, the claimed $370,000 extended in barter reflected the amount of the worthless resort credits, which we already discussed, and the $250,000 investment in the business was attributed to a third party. While Resort claims it should be able to recover for

losses incurred by Brink and his son, those individuals were not parties to this action.

Unlike the situation in *Gerwin*, the evidence presented in our case was less than sufficient to prove the value of Resort. Unfortunately, Resort has failed to address this issue in either its opening or reply briefs.

## CONCLUSION

The trial court complied with the procedural requirements of section 657. There was more than sufficient evidence to support the trial court's findings the jury award was excessive. The jury's consideration of speculative evidence of lost profits and insufficient evidence of business valuation, resulted in an unjustified award. The jury attempted to hold Laser responsible for the solvency of Resort's business, and that finding was contrary to the evidence.

The issue of whether Resort should be awarded damages is not in dispute, only the amount of the award. On this record, the only credible damage evidence Resort produced was, as acknowledged by the trial court, the value of the discs, an amount less than $30,000. The evidence did not support a $975,000 award. The trial court did not abuse its discretion in granting Laser's motion for a new trial.

## DISPOSITION

The trial court's order granting Laser a new trial on the issue of damages is affirmed. Each party to bear its own costs on appeal.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied July 18, 1995.