Filed 8/18/15  Terfehr v. Western Lightwave CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROGER TERFEHR et al., | |
| Plaintiffs and Respondents, | G050901 |
| v. | (Super. Ct. No. RIC 10014195) |
| WESTERN LIGHTWAVE, INC., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Riverside County, Phrasel L. Shelton, Judge.  (Retired judge of the San Mateo Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed and remanded with directions.

Lieberg Oberhansley & Strohmeyer and William H. Strohmeyer for Defendants and Appellants.

Law Offices of Rodney Lee Soda and Rodney Lee Soda for Plaintiffs and Respondents.

\*          \*          \*

# I. INTRODUCTION

Pamela and Roger Terfehr "merged" their sole proprietorship, Advanced Systems, into Western Lightwave, Inc. In practical effect, the merger meant that the Terfehrs signed over all the assets of Advanced Systems, both tangible and intangible, to Western Lightwave. In return, the Terfehrs got a promise of stock in Western Lightwave equal to the value of Advanced Systems, plus at-will employment in a managerial capacity at Western Lightwave. But the merger never quite jelled. The Terfehrs never received the stock they should have gotten in Western Lightwave, and, though they spent about two months on the Western Lightwave payroll, were soon fired. They lost most, but not all, of the hard-assets transferred in the aborted merger.

The question on appeal is the damages to which the Terfehrs are entitled. They never showed that Advanced Systems had any value above its hard assets. They never sued for breach of contract, wrongful termination, or breach of the implied covenant of good faith and fair dealing. And the evidence, even as to the hard assets, didn't support the figure the trial court awarded. Accordingly, we must reverse the judgment in its entirety to the degree it awards the Terfehrs any amounts beyond the hard assets, and reverse the judgment with directions to recalculate the value of the hard assets.

# II. FACTS

In the last months of 2009, Pamela and Roger Terfehr owned an electrical contracting firm in the form of a sole proprietorship, Advanced Systems. The company did various kinds of electrical and electronic communications work, for which it possessed the necessary specialty licenses. Its work included building cell phone towers for AT&T. But Pamela was ill with cancer, and Roger wanted to spend more time with

2

her.[1] Roger explored the possibility of selling Advanced Systems outright to Western Lightwave, Inc., a company that did similar work. Roger's asking price for a direct sale was $1.2 million. Robert Sackett, the CEO of Western Lightwave, balked at the price. Sackett did, however, suggest a "partnership" as a way of allowing Roger Terfehr to spend extra time with Pamela.

Terfehr and Sackett reached an agreement though, strictly speaking, it was not a partnership agreement. Rather, it contemplated a merger between Western Lightwave and Advanced Systems. An unsigned letter of intent printed on Western Lightwave stationary on November 30, 2009, proposed the merger. Terms included Roger becoming Western Lightwave's director of operations for the Central Valley at a salary of $70,000 a year, and Pamela becoming an office manager for Western Lightwave's Menifee office at a salary of $37,440.[2]

While the November 30 letter was never signed, the parties did sign a formal written agreement on January 4, 2010. The January 4 document was short, consisting of only one page. It provided that Advantage Systems would merge operations with Western Lightwave. Practically speaking, this merger was a simple acquisition of Advantage Systems by Western Lightwave. Western Lightwave was to receive "all existing contracts, licenses and assets" of Advanced Systems, there would be no name change, and Western Lightwave was to be the "paymaster" of the combined operations. Roger Terfehr was to become an officer of Western Lightwave and the Terfehrs would receive "dollar for dollar" Western Lightwave stock.

The terms of the Terfehrs' employment set forth in the January 4 document are terse. Read as a whole, the document indicates that the Terfehrs would be in charge

---

[1]    Where the context requires, we will refer to Pamela or Roger by their first names, even though such a reference is asymmetric compared to their main adversary, Robert Sackett. (We don't refer to him as Robert.) Sometimes the need for clarity trumps formal symmetry.

[2]    While the written agreement in our record is not signed by either party, we will assume Western Lightwave intended to be bound by such terms because it is on Western Lightwave stationary.

3

of Central Valley operations, and their employment would continue only as long as both (1) their "respective operation" was profitable and (2) "all parties are in agreement."[3]

The exact language of the dollar-for-dollar provision is quoted in the margin.[4] The provision required Sackett and the Terfehrs to agree to the total value of Advanced Systems – made up of both tangible and intangible assets, presumably including goodwill – with Western Lightwave to provide a "professional valuation" of its own value "for comparison."

No transfer of Western Lightwave stock ever took place, though. At the time, as Roger Terfehr later admitted at the trial, Advanced Systems had "pretty bad" cash flow problems, so it didn't have the $5,000 necessary to pay for an evaluation.

The record thus contains *no* formal evaluation of Advanced Systems, and it is clear – both parties agree – that Advanced Systems was never valued as contemplated by the January 4, 2010 agreement. Nevertheless, the Terfehrs signed over all their hard assets. But *not* to Western Lightwave. Rather the documents that were signed transferred ownership to the *owner* of Western Lightwave, Western National Holding, Inc.[5] It is a small bone of contention in this appeal whether Roger was actually aware he was signing over his assets to a company other than Western Lightwave.[6] Since we conclude that the trial court was correct in finding negligent misrepresentation on Western Lightwave's part, we need not explore that matter further except to note that

---

[3] The agreement could be a poster child for why business people sometimes actually need lawyers. Its terms are so lopsided in favor of Western Lightwave that it is difficult to imagine that anyone who could pass the bar exam would have allowed the Terfehrs to sign it. The best one can say about the agreement from the Terfehrs' point of view is that because it was obviously drafted by Western Lightwave, any ambiguities in the agreement would be reasonably construed in the Terfehrs' favor.

[4] "Owners of AS will receive dollar for dollar in WLI stock. WLI and AS owners will agree to the value of AS assets tangible and intangible and WLI will provide a provide a professional valuation to show the current value of its stock for a cost comparison."

[5] There is only one share of Western Lightwave stock outstanding, and it is held by Western National Holdings.

[6] Roger testified both that he (1) became aware the hard assets went to Western National "[w]hen we first saw the registration" and (2) that the "documents" he signed did not say the items were going to Western Lightwave but "to another company we didn't know nothing about." Obviously he didn't scrutinize scrutinize the documents sufficiently to detect the switch from Western Lightwave to Western National.

4

Robert Sackett testified that his intent was to have Western National lease back the assets to Western Lightwave.

In any event, the Terfehrs *did* begin working as employees of Western Lightwave, beginning on or about January 4, 2010. But the employment relationship was short-lived. By March 1, Sackett was dissatisfied with Roger's performance over the logistics of a possible bid for AT&T work. Like so much else in this record the nature of the dispute was not developed at trial, but from what little there is (an email exchange on March 1) it appears Roger Terfehr had held off bidding on an AT&T project because he didn't think the company was capable of starting work "the very next day," which was apparently an AT&T requirement. Sackett was clearly displeased.

The ax fell on Sunday March 7, 2010, when Sackett sent Roger Terfehr an email terminating the Terfehrs' employment because of apparent lack of profitability. ("Your department and employment was contingent on profitability. You were far from that.") The next day, March 8, the Terfehrs' attorney (also representing them in this appeal) sent Sackett a demand for rescission based on "certain irregularities and improper business practices" – not spelled out in the letter except to say Sackett had not "satisf[ied] the terms" of the January 4, 2010 merger agreement. The letter demanded restoration of all assets transferred out of Advanced Systems, and concomitantly offered to "return all consideration received from you as well."

Litigation commenced July 19, 2010. The case went to trial on only three of causes of action: a first cause of action for rescission and related damages, a third cause of action for intentional misrepresentation, and a fourth cause of action for negligent misrepresentation. The first cause of action for "Rescission/Damages" named only Western Lightwave, Inc., as a defendant. The third and fourth causes of action for varieties of misrepresentation included both Western Lightwave *and* Robert Sackett.[7]

---

[7] Where applicable, as in our discussion of the negligent misrepresentation cause of action *post*, the designation Western Lightwave refers collectively to both the corporation itself and Robert Sackett the individual.

5

At trial the Terfehrs offered no evidence of the actual value, income, or profitability of Advanced Systems. They proffered no income statement, balance sheet or tax return. They offered only a formal inventory of the company's hard assets with no itemization of values, and two IRS 1099 forms from AT&T, for the years 2008 and 2009. The 1099 for 2008 showed $657,066.36. The 1099 for 2009 gave a figure of $429,673.91. Terfehr admitted on the stand that each year's figures were gross revenue paid by AT&T, not net revenue.

It is noteworthy that the absence of evidence on Advance Systems' actual value appears to be a strategic decision on the part of Terfehrs' counsel and not the product of inadvertence. After Roger Terfehr had finished testifying on direct examination, much of Western Lightwave's cross-examination of him focused on the fact he'd just put on his case without any evidence of net profit. In that cross-examination, Terfehr alluded to the fact he *had* tax returns and his attorney had looked at them, and he acknowledged the 1099's only showed gross income. He also acknowledged that, in fact, he had nothing to show his cost of doing business. But there was no motion to reopen testimony or otherwise admit evidence to correct the omission, which is not surprising given Terfehr's earlier testimony Advanced Systems' cash flow in late 2009 was so bad that the company didn't have enough money to pay for a $5,000 appraisal. In closing argument, the Terfehrs' attorney relied solely on Roger Terfehrs' testimony that he had personally valued his company at $1.2 million – "twice the gross revenue" – and asserted Terfehr was allowed to use "gross earnings as a multiple."

The trial judge took the case under submission and rendered his decision in a minute order dated September 18, 2012, but filed on September 20, 2012. The minute order said: "Judgment *shall be* entered ordering rescission and damages in the amount of $170,000.00 for lost inventory, and $268,600.00 for lost revenue from March 8, 2010, totaling $438,600.00 plus costs." (Italics added.)

6

The court heard and denied a new trial motion on January 17, 2013, as reflected in a minute order of that date. But instead of a formal order denying the new trial motion, Terfehrs' counsel prepared a proposed formal judgment. That proposed judgment was served on March 1, 2013. It was almost immediately objected to by Western Lightwave because it included Robert Sackett on the *first* cause of action for rescission when he hadn't been made a defendant on that cause of action in the pleadings. While the objection was still pending, on March 13, 2013, counsel for Western Lightwave – obviously concerned about a potential 180-day deadline looming ahead[8] – filed a notice of appeal from the "Judgment after court trial" ostensibly "entered on" September 20, 2012. The trial judge signed an "amended judgment" (this one deleting Sackett from the cause of action for rescission) on April 15, and the amended judgment was filed April 24, 2013. A court clerk served a copy of the amended judgment on counsel for Western Lightwave on May 22, 2013.[9]

### III. DISCUSSION

A. *The $268,600 for "Lost Revenue"*

We begin with the big figure in the judgment, the $268,600 for "lost revenue" based on the negligent misrepresentation cause of action. We first dispose of Western Lightwave's threshold argument that there was no negligent misrepresentation at all.

There is no question the Terfehrs were supposed to receive, under the written merger agreement, stock in Western Lightwave at least *equal to* the value of their

---

8    See California Rules of Court, rule 8.104(a)(1)(C) [in any event, appellate deadline expires 180 days after entry of judgment]. All further undesignated references to a rule are to the California Rules of Court.

9    The notice of appeal filed March 13, 2013 was in fact premature. The minute order filed September 20, 2012 was not a final appealable judgment, because it said judgment "shall be" entered. Under *Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 903, we construe ambiguities in threshold appellate documents to preserve the right to appeal, not defeat it. The use of the future tense word "shall" signaled that a further document would need to be filed, rendering the minute order of September 20 only interlocutory, not immediately appealable. (See *Herrscher v. Herrscher* (1953) 41 Cal.2d 300, 304 [if unsigned minute order requires "further or formal order," then it is not final, appealable judgment].) Since the appeal was premature, we exercise our discretion to entertain it now. (See Cal. Rules of Court, rule 8.104(d)(2).)

7

old company, Advanced Systems. The provision meant they could not lose the value of their company in the deal. But they never got that stock, despite the transfer of at least $180,000 in hard assets to Western Lightwave. Even if the failure to issue the stock was merely the result of negligence on Western Lightwave's part, the fact remains the Terfehrs were promised Western Lightwave stock having at least a $180,000 value, and didn't get it.[10]

Turning to the merits of the $268,600 figure, however, we find insubstantial evidence to uphold the trial court's judgment. The judgment cannot be upheld as compensation for money the Terfehrs *would have made* between the date they were fired and the date of the trial court's minute order, because to do so contradicts the grant of rescission. The idea of rescission is to restore the parties to their former decision by requiring the return of the consideration each has received from the other. (*Runyan v. Pacific Air Industries, Inc., supra,* 2 Cal.3d at p. 316.) To award the Terfehrs what they would have earned if the merger had not been rescinded gives them one of the two major benefits of the contract they successfully had rescinded. Moreover, the award cannot be upheld as wrongfully lost salary or wages, because the Terfehrs never sued for wrongful termination or even breach of contract. And there is no argument in their papers at either the trial or appellate level that Western Lightwave somehow violated the implied covenant of good faith and fair dealing.

Nor can the $268,600 be upheld based on the loss of Advanced Systems as an ongoing business. The Terfehrs showed no such damage beyond the loss of the hard assets signed over to Western Lightwave. As noted, there was no expert witness. There were no tax returns, balance sheets, income statements, or even testimony as to net income. The strongest evidence in favor of a finding that the value of Advanced

---

10      For this reason it is unnecessary to dwell on Western Lightwave's secondary argument that because the Terfehrs consented to having assets assigned to *Western National*, they were somehow not harmed by the switch from National Lightwave to National Holdings.

Systems' intangible assets was at least $268,600 were the allusions – and that's all they were – in Roger Terfehr's testimony to his *asking price* for Advanced Systems in his negotiations with Sackett.[11]  He testified that he based his asking price of $1.2 million based on "two times" the gross amount of the 1099 forms from AT&T for the years 2008 and 2009.  Terfehr was never actually asked:  "Do you have an opinion of the value of Advanced Systems as of the date it was transferred to Western Lightwave?"  And against even this thin evidence is Terfehr's admission that Advanced Systems was so strapped for cash in late 2009 that it could not afford $5,000 for an independent appraisal.

Manifestly, this evidence cannot support the award of $268,600 – or any other amount for that matter – as the value of Advanced Systems' intangible assets.  It may be true that in some circumstances an owner's opinion as to the value of his or her personal property can be substantial evidence of its value.  (E.g., *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921.)  But that principle must be balanced against the equally valid rule that opinion evidence is "only as good as the facts and reasons on which it is based."  (E.g., *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 763; *Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523 [same]; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 ["The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed"].)

Insofar as the intangible value of a business' goodwill or the value of its relationship with one deep pocket customer is concerned, something more is needed than the raw opinion of an owner based on nothing more than gross intake from that customer.  That point is illustrated by *Resort Video Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1700 (*Resort Video*), where the Court of Appeal found an owner's opinion of the value of his lost business *in*sufficient to establish the value of that

_____

11      Here is a more specific summary of Roger Terfehr's testimony on the value of Advanced Systems: A sale price of $1.2 million was "discussed" with Robert Sackett.  Terfehr gave Sackett an "asking price" of $1.2 million.  Terfehr "determined" the value of the AT&T contracts at "two times value."  And the "potential work" represented by the AT&T contracts was "the million dollars" he had earlier "testified to."

9

business. *Resort Video*, in fact, applies a fortiori to the case at hand because that owner's opinion was supported by far more than two 1099's from a good customer. (See *id.* at pp. 1700-1701.)

In *Resort Video*, an entrepreneur started a business that depended on marketing video laser disc presentations of about various resorts to travel agencies. His supplier of discs, however, did not deliver discs of sufficient quality, causing the business to fail. The entrepreneur's opinion of the value of his business was that it was worth $975,000, and it was backed up by far more detailed financial information than Terfehr provided here: He provided evidence of the company's expenses, overhead and salaries, capitalization and some accounts receivable by way of barter. (*Id.* at p. 1700.) But he provided no evidence of net profit, or a balance sheet, ledger, income statement, or any document to show "profits or worth." (*Id.* at p. 1699.) Even so, held the *Resort Video* court, the evidence was "less than sufficient" to "prove the value" of the lost business. (*Id.* at p. 1701.)[12]

The Terfehrs' only response to the *Resort Video* decision is to say that it was Western Lightwave who should have produced evidence of its net profits. The argument forgets that the Terfehrs were the plaintiffs and it was they who had the burden of producing evidence to show their damages from the loss of their business. (*Sullivan v. Kantel* (1954) 124 Cal.App.2d 723, 725 [noting burden is on the plaintiff to "produce evidence in support of the affirmative allegations of his complaint"].) We should also point out the obvious: A company taking in considerable amounts of gross revenue may still not be profitable. (See *Payne v. Crossley* (1952) 115 Cal.App.2d 72, 73 [noting a

---

12      In some instances, on-going businesses can be valued as a multiple of gross earnings. (See, e.g., *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 633 [expert witness used three different valuation methods to value husband's investment advisory business, one of which was multiple of gross earnings].) Typically, though, such businesses are professional service businesses such as law firms who do not use heavy capital equipment. (See Fergusen & Camp, *Valuation Basics and Beyond: Tackling Areas of Controversy* (Summer 2001) 35 Family Law Q. 305, 321-322 [noting existence of industry rules of thumb to establish value.) In the present case the Terfehrs offered no evidence that multiples of gross revenue are appropriate in the cell tower construction industry, or even why the multiple should be 2 as distinct from any other number.

"gross income of a considerable amount was earned but was insufficient to prevent financial difficulties"].)  If the value of the company was going to be based on *just* gross revenue, it was incumbent on the Terfehrs, as plaintiffs with the burden of proof, to present *some* evidence that in their industry it is acceptable to value a business merely on its gross revenue.  None was presented.

B.  *The $170,000 for the Hard Assets*

   While we uphold the Terfehrs' rescission and their right to some sort of rescission damages award – after all, they did clearly lose many of their hard assets – we also conclude the $170,000 figure is too high.  Roger testified that the total amount of Advanced Systems' hard assets was $180,000.  He later testified that the total amount of "items . . . that were either scrapped or liened" was $10,000, which gives us the $170,000 figure in the judgment.  But as Western Lightwave now points out, Roger also testified that he had, in his possession, a quantity of assets which he had recovered from Western Lightwave –and he gave no indication that these were assets that he recovered by way of asserting some unexplained lien.  Specifically Roger directly admitted he had the following items of property in his possession on the day of trial:  a "65 Hogg Davis, 2004 dump trailer," a "large cable cutter," an undisclosed number of "grips," a "copper splicing tool," two "Synflex pull jacks," two " Tanaka drills," "two of the routers," a "32-foot ladder," a "copier," and "all the office equipment."

   Given that Terfehr testified he had something like 10 different items in his possession at the time of trial, it is hard to find substantial evidence the $10,000 figure was correct.  The Terfehrs never explain how those items were somehow within all the items that were sold for scrap or liened.  The $170,000 figure will have be reversed because it was too high, since the $10,000 figure was too low.  How much higher the $10,000 deduction must be, however, we cannot say, so a remand will be necessary for the court to ascertain the figure.

11

## IV.  DISPOSITION

To the degree the judgment grants any damages for negligent misrepresentation for "lost revenue," it is reversed with directions to enter a new judgment for zero damages.  To the degree the judgment grants rescission damages of $170,000 for lost inventory, it is reversed with directions to the trial court to ascertain the value of the equipment Roger Terfehr admitted he had in his possession on the day of trial and deduct it from the $170,000. [13]  In our discretion we think justice is best served by having each side bear its own costs on appeal.

                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.

---

[13]     For the benefit of the trial court on remand, the list is itemized on page 36 of the Reporter's Transcript.