[No. C050813. Third Dist. Mar. 21, 2007.]

GARLOCK SEALING TECHNOLOGIES, LLC, Plaintiff and Appellant, v. NAK SEALING TECHNOLOGIES CORP., Defendant, Cross-complainant and Appellant;
SUNRISE TRADING CO., Defendant, Cross-defendant and Respondent.

938

**COUNSEL**

Rutan & Tucker, Ronald P. Oines and Treg A. Julander for Plaintiff and Appellant.

Solunce PLLC, Scott Payzant; Kroloff, Belcher, Smart, Perry & Christopherhson and Velma K. Lim for Defendant, Cross-complainant and Appellant.

Wilke, Fleury, Hoffelt, Gould & Birney, Thomas G. Redmon and Daniel L. Baxter for Defendant, Cross-defendant and Respondent.

## OPINION

**CANTIL-SAKAUYE, J.**—Reliance Electrical Industrial Company doing business as Rockwell Automation Power Systems (Rockwell) sued Garlock, Inc., predecessor of Garlock Sealing Technologies, LLC (Garlock), after industrial oil seal products Garlock sold to Rockwell caused significant oil leakage problems in the industrial gear reducers Rockwell manufactured. After Garlock settled the lawsuit with Rockwell, Garlock filed this action against its suppliers of the oil seals, NAK Sealing Technologies Corporation, formerly Mao Shun Oil Seal Industrial Company, Ltd. (Mao Shun), and Sunrise Trading Company, LLC (Sunrise Trading). Mao Shun and Sunrise Trading each filed cross-complaints against each other.

Mao Shun appeals the trial court's judgment awarding Garlock damages for Mao Shun's breach of the implied warranty of merchantability and ordering Mao Shun to indemnify Sunrise Trading for its costs of defending the Garlock action. Garlock appeals the trial court's denial of its claim for implied indemnity. We shall affirm the judgment awarding Garlock damages and ordering Mao Shun to indemnify Sunrise Trading. We shall reverse the portion of the judgment denying Garlock's claim for implied contractual indemnity.

### FACTUAL AND PROCEDURAL BACKGROUND

Garlock is a company specializing in designing, manufacturing, testing and selling industrial sealing products, including oil seals. Mao Shun, located in Taiwan, is a manufacturer of oil seals and has been in the business of selling oil seals for 20 to 30 years. Sunrise Trading is a California company engaged in the importation and sale of goods, including oil seals manufactured by Mao Shun. Garlock first placed a trial piece of business with Mao Shun through Sunrise Trading in the early 1980's. Thereafter, Garlock ordered radial lip-type oil seals from Mao Shun and resold them to Rockwell for use in Rockwell's gear reducer boxes, which gearboxes were in turn used for conveyor belt systems in distribution warehouses.[1]

---

[1] A gear reducer is a mechanical device that speeds up or reduces the speed of a rotating shaft, at the same time increasing or reducing the torque of a rotating shaft. Gear reducers usually contain oil because it is a necessary lubricant for the gear teeth and for the bearings. Oil seals are usually installed on the input and output shafts of the gear reducers to make sure that the oil is contained and that external contaminants do not enter the gearbox. A radial

In 1997 Rockwell was having problems with oil seals that were made from nitrile rubber, which Garlock was supplying to Rockwell for use in Rockwell's gear reducer boxes.[2] The nitrile rubber was almost melting and cracking from excessive heat in the gearboxes, resulting in a 5 to 6 percent oil leakage rate for the gear reducers. At that time, Rockwell also wanted to switch from a mineral-based lubricant to a synthetic lubricant with which the nitrile material was not compatible. Rockwell and Garlock worked together to come up with a solution which would use a step case radial lip-type oil seal made from a fluoroelastomer polymer called viton instead of the nitrile rubber. The selection of a radial lip-type oil seal made from viton was an appropriate selection for the gearbox application of Rockwell based on consideration of shaft speed, size compatibility, and heat tolerance. The operating conditions for Rockwell's use of the seals were not unusual or excessive for viton seals. The operating conditions involved a typical application, which a viton polymer properly formulated should be able to handle easily.

Garlock did not normally make bonded oil seals and the proposed step case seals were both smaller in diameter and required higher volumes than Garlock normally made. In May of 1998 Garlock contacted Mao Shun through Sunrise Trading to see if Mao Shun could produce the proposed viton step case seals. Garlock had experience with Mao Shun's standard brown viton compound since perhaps as early as 1992, although the volume of brown viton seals previously purchased by Garlock was extremely small.[3] Garlock provided Mao Shun with drawings and specifications for the new seals. The specifications, which would have been similar to the "RA-37" specification used for ordering the nitrile rubber seals except for the material being viton, covered the physical materials, properties and dimensions of the seals. Garlock's manager of engineering, James Drago, did not know if Garlock specified the color of the viton to be used by Mao Shun, but he testified it was common for viton products to be colored brown to distinguish them from other rubber compounds. Drago understood Garlock's RA-37 specification asked Mao Shun to use its standard brown viton compound. Garlock did not tell Mao Shun how to compound its viton or specify any particular iron oxide as the brown pigment for the viton. Garlock did not

---

lip-type oil seal is an oil seal with a rubber lip that rides on the continually rotating hardened steel shaft to contain the oil and grease.

[2] The nitrile oil seal problems were not at issue in this litigation.

[3] Sometime in the second quarter of 1998 Garlock had notice that Rockwell was reporting leaks with the brown viton seals it was already using in some existing configurations. Garlock did not consider the problem chronic or widespread, probably because of the very small numbers of seals involved.

consider it necessary to provide its own internal specification for iron oxide (for the brown viton) to Mao Shun based on its previous experience with Mao Shun and Mao Shun's reputation as a manufacturer of oil seals.

Based on the specifications and information provided by Garlock in RA-37, Mao Shun prepared the technical drawings for the seals. Mao Shun created a new mold for a step case radial lip-type oil seal based on Garlock's specifications and sent Garlock samples of the newly configured step case seal, including a slab of the brown viton compound from which the seals were to be made. Garlock maintains three testing facilities onsite: a chemical testing lab; a physical testing lab; and a functional testing lab. The functional testing lab can be used to duplicate the circumstances under which an oil seal is used in the field to check its performance. Garlock tested the Mao Shun samples for purposes of ensuring they were the proper configuration, dimension, and otherwise met specification requirements. Garlock did the normal tests designated by the American Society for Testing and Materials (ASTM) to check the basic physical properties of the rubber brown viton compound. The seals met specifications and passed the standard ASTM tests. Garlock did not do any functional testing of the samples. Although Garlock would normally do functional testing for a newly configured component with a new compound, Garlock considered these seals to be a standard design configuration not made with a new compound. The seals were not something on which Garlock felt compelled to do functional testing. Garlock had no reason to suspect Mao Shun's brown viton seals contained abrasives.

Mao Shun manufactured the new step case seals with its brown viton compound molded around a steel insert. The raw viton material used by Mao Shun for these seals was provided to Mao Shun by a Taiwanese distributor for DuPont. Mao Shun then combined the viton with several fillers, pigment, processing agents and livening agents to make the compound material for the seals according to its own formula. The pigment was a red oxidized iron powder supplied by a distributor for Bayer Corporation, a reputable supplier of pigment. Mao Shun ordered Bayer's grade 225 iron oxide. In 1998 Mao Shun's purchasing specifications for the pigment did not include anything regarding particle size. Mao Shun did not test for particle size or sift the pigment. However, Bayer provided an inspection report and certification of its materials to Mao Shun, which Mao Shun verified by standard testing.

In the fall of 1998 Garlock placed orders for the Mao Shun brown viton step case oil seals with Sunrise Trading. Depending on the delivery time requirements, Mao Shun either shipped the manufactured brown viton oil seals to Sunrise Trading by sea, or air freighted them directly to Garlock. Oil

seals were shipped throughout the fall, but the bulk of the seals appear to have been shipped in December 1998 and later. Garlock supplied the Mao Shun oil seals to Rockwell.

In late 1997 Rockwell started using a brown viton oil seal manufactured by Mao Shun for one model of gear reducer that was having the most significant leak rate with the nitrile oil seals. Subsequently, Rockwell incorporated the brown viton seals into other models of its gear reducers. Rockwell sold its gear reducers with the brown viton oil seals to at least seven or eight original equipment manufacturers who incorporated them into conveyance systems for large distribution centers operated by, for example, Anheuser-Busch, Coke, Pepsi, and Wal-Mart. Also, if a Rockwell customer had a leaking nitrile seal, Rockwell replaced those seals with a brown viton seal. Garlock was Rockwell's sole supplier of brown viton seals.

Vici Bushey, Rockwell's warranty administrator, began noticing a trend of claims for gear reducers with brown viton seals that were leaking oil in late 1997 or early 1998. Rockwell referred the problem to its engineers and quality control people. Eventually, Rockwell experienced almost a 30 percent leak rate for the brown viton sealed units. This was considered a catastrophic leakage rate. Rockwell lost customers. When new business was bid, some companies specified Rockwell would not be accepted as a supplier.

William Pizzichil testified his principal duty when hired as Rockwell's gear engineering manager in November 1998 was to solve the leakage problem. He visited many customer facilities and observed considerable oil leakage on many gear reducers. The gear reducers were brought back to Rockwell facilities, where engineers disassembled them for examination. The primary characteristic found was excessive damage or grooving to the rotating shaft in the gearbox. Grooving of the shaft can reduce the contact between the seal and the shaft resulting in oil leakage, possible oil carbonization, and eventual wear of the seal. If all of the oil in the gearbox is lost, the gearbox will burn up. It was a very unusual failure. Some of the failures were occurring after only 150 hours (about six days) of operation.

Toward the end of 1998 Rockwell brought the problem to the attention of Garlock. Garlock contacted Sunrise Trading in December 1998 into January 1999 regarding the problem. Sunrise Trading immediately referred the matter to Mao Shun and told Garlock to speak directly with Mao Shun.

Working with Garlock, Rockwell engineers looked at the temperature and kind of media the seals were being exposed to, the speed of the shafts, the frictional heat and adequacy of the lubrication. Eventually a test was designed where a gear reducer with a brown viton seal was run completely submerged in oil to eliminate any question of inadequate lubrication. After several days of running, there were grooves in the hardened steel shaft of the gearbox. The engineers concluded the problem was in the brown viton seal. In his 39 years of experience in the gear manufacturing industry Rockwell's manager Pizzichil had never before seen this type of problem. Garlock engineers were totally surprised this could happen. An analytical study of the seal material was determined to be necessary.

Garlock took samples of Mao Shun's brown viton, the brown viton oil seals, and samples of green and black viton to McCrone Associates, Inc., for scanning electron microscopy and X-ray diffraction analysis. The laboratory analysis found the only material present in any of the samples that could cause the damaged steel shafts was large iron oxide particles with smooth faces and sharp edges found in Mao Shun's brown viton sample and seals. The material was determined to be magnetite, a very hard and potentially abrasive substance. A test of magnetite by Garlock showed it scratched glass. The presence of particles of abrasive magnetite at the lip edge of the oil seal would account for the grooving of the steel shaft in the gear reducer. The presence of abrasive material resulted in defective seals. Garlock's expert, Leslie Horve, stated one of the purposes of oil seals is to prevent premature oil leakage and when a seal experiences premature leakage it has not performed its intended purpose and has failed.

Horve testified if Mao Shun had run a dispersion test on its batches of brown viton, Mao Shun may have been able to identify the problem particles in the compound. Mao Shun did not run dispersion tests on its compound in 1998 and 1999.

Garlock questioned Mao Shun as to whether the problem could be a bad batch of brown viton. When Garlock did not get information from Mao Shun that it was a bad batch, Garlock believed the only safe conclusion was that all of the brown viton seals were bad.

Mao Shun contended it followed strict quality control procedures for its processing of the brown viton. It had used the same manufacturing process and quality control procedures for its brown viton since 1997. None of its other customers had reported problems with the brown viton.[4] An engineering expert for Mao Shun, Stephen Andrew, testified iron oxide pigment would be made from iron mixed with nitrobenzene to get magnetite, which would then be heated to form hematite for the correct brown color. In the process, some magnetite would naturally be left in the pigment.

Garlock's tests comparing Mao Shun's brown viton to materials made with Garlock's iron oxide pigment, however, showed Mao Shun's brown viton was more abrasive than Garlock's material. A chemical laboratory report found Mao Shun's iron oxide to be coarser than the iron oxide purchased from Garlock's own supplier.

While these investigations were going on, Rockwell continued to use Garlock's (Mao Shun's) brown viton seals in their gear reducers because there was no other available material for the seals at that time and Rockwell still needed to meet its customers' needs. In the spring of 1999 Garlock requested Mao Shun to manufacture the step case radial lip-type oil seals using green viton Garlock supplied. Rockwell got the green viton seals from Garlock in April 1999 and proceeded to replace thousands of gear reducer units and all brown viton seals with green viton seals. The leakage rate immediately went down to 1 or 2 percent and there was no shaft grooving.

In January 2000 Vincent Tsai, the Mao Shun salesman responsible for selling to Sunrise Trading, sent an e-mail to Drago at Garlock stating that after long testing and discussion, Mao Shun confirmed that its brown viton was more abrasive to shafts than Garlock's material. According to Tsai, all of Mao Shun's engineers agreed with Garlock's testing results. Scotch Hang, an engineer with Mao Shun, denied telling Tsai he agreed with Garlock's testing results. Tsai did not discuss his e-mail with Hang or his supervisor before sending it to Garlock. .

On August 31, 2001, Rockwell filed a lawsuit against Garlock in the federal district court for South Carolina seeking damages for Garlock's breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and contractual

---

[4] James Drago testified, however, he knew one other customer of Mao Shun, Curtis Machine, who was having problems with Mao Shun's brown viton. Darin Thibideau, Sunrise Trading's manager of sales and marketing, testified he was told by Garlock that it had received a seal from a company called Transcom with similar score markings suggesting the problem was bigger than just Rockwell.

indemnification. Garlock filed a third party complaint in the action against Mao Shun, but dismissed it without prejudice when personal jurisdiction over Mao Shun could not be established in South Carolina. Garlock decided to settle the Rockwell case after document discovery, depositions and the exchange of expert reports were completed. Garlock concluded Rockwell would win its case if it went to trial, exposing Garlock to potential damages in excess of $5 million. Under the terms of the settlement agreement, Garlock paid Rockwell $2.2 million in cash, gave Rockwell $150,000 in product refunds and discounts and extended further product discounts of up to $530,000, for a total settlement value of $2.88 million.

On October 4, 2002, Garlock filed this action against Mao Shun and Sunrise Trading for declaratory relief regarding implied equitable indemnity, breach of express warranties, breach of implied warranties, breach of contract, and breach of the implied covenant of good faith and fair dealing. Mao Shun and Sunrise Trading each filed cross-complaints against each other.

After a court trial, the trial court concluded, among other things, that Sunrise Trading was acting as Mao Shun's agent in consummating the brown viton sales transactions with Garlock and that Mao Shun breached the implied warranty of merchantability. The court awarded Garlock damages of $1,870,424 in lost profits, consequential and incidental damages, plus interest and costs of suit against Mao Shun. It denied Garlock's claim of equitable indemnity against Mao Shun. The trial court ordered Garlock take nothing by its complaint against Sunrise Trading and awarded Sunrise Trading its costs of suit against Garlock. The trial court ordered Mao Shun take nothing by its cross-complaint against Sunrise Trading and awarded Sunrise Trading on its cross-complaint against Mao Shun its legal costs, expenses and fees incurred in defending Garlock's action.

## DISCUSSION

## MAO SHUN'S APPEAL

### I.

### The Implied Warranty of Merchantability Does Apply to This Case

Mao Shun argues the implied warranty of merchantability is inapplicable to this case for two reasons. First, according to Mao Shun, such implied warranty is inconsistent with the trial court's finding of fact and conclusion of law that Mao Shun manufactured the brown viton oil seals in compliance

with the RA-37 specifications Garlock provided. Second, Mao Shun, claims the implied warranty is precluded by California Uniform Commercial Code section 2316, subdivision (3)(b)[5] (exclusion or modification of warranties). We disagree with both claims.

A. *The RA-37 Specifications*

Mao Shun contends application of the implied warranty of merchantability is precluded in this case as a matter of law because the trial court concluded RA-37 was an express warranty relating to the brown viton oil seals and then found Mao Shun manufactured the seals in compliance with the RA-37 specification. Mao Shun relies on *Carpenter Steel Co. v. Pellegrin* (1965) 237 Cal.App.2d 35 [46 Cal.Rptr. 502] (*Pellegrin*), pointing to its language that where a product " 'is made according to plans and specifications, there is no implied assurance or warranty that it is adequate for the buyer's purpose, or even for the general purpose for which such things are designed. If the article corresponds with the plans and specifications, the manufacturer cannot be held liable . . . .' " (*Id.* at p. 38.)

The trial court found RA-37 controlled Mao Shun's manufacture of the oil seals based on the parties' extensive course of dealings. However, contrary to Mao Shun's representation in its opening brief, the trial court did not characterize RA-37 as an express warranty. The only express warranty found by the trial court was the express warranty that the manufactured oil seals would conform to the sample oil seals and brown viton slabs provided by Mao Shun to Garlock prior to the creation of the parties' contract. (§ 2313, subd. (1)(c).)

Even assuming RA-37 was an express warranty that the oil seals would conform to the RA-37 specifications, an implied warranty of merchantability is not precluded.

■ Section 2314, subdivision (1) (implied warranty; merchantability; usage of trade) provides a warranty of merchantability is implied in every contract for the sale of goods if the seller is a merchant with respect to goods of that kind, unless it is excluded or modified as provided in section 2316. Mao Shun is a merchant with respect to oil seals of this kind. A warranty of merchantability will normally be included in its sale of oil seals. (We will consider Mao Shun's argument that the implied warranty is excluded by § 2316 in the next portion of our discussion.) ■ Section 2317 (cumulation and conflict of warranties express or implied) requires express and

---

[5] Hereafter, undesignated statutory references are to the California Uniform Commercial Code.

implied warranties to be construed as consistent with each other and as cumulative unless such construction is unreasonable, in which case the intention of the parties determines which warranty is dominant. In ascertaining that intention, "express warranties displace[] *inconsistent* implied warranties other than an implied warranty of fitness for a particular purpose." (§ 2317, subd. (c), italics added.) The trial court determined the express warranty created by sample was not inconsistent with the implied warranty of merchantability and the same is true for any express warranty in the RA-37 specification.

The implied warranty of merchantability and the express warranty of the RA-37 specification can be reasonably construed as consistent and cumulative. The RA-37 specification covered the physical materials, properties and dimensions of the seals. The RA-37 specification may have requested Mao Shun's standard brown viton compound, but Garlock did not tell Mao Shun how to compound its viton or specify any particular iron oxide as the brown pigment for the viton. Garlock did not provide its own internal specification for iron oxide to Mao Shun, but relied on its previous experience with Mao Shun and Mao Shun's reputation as a manufacturer of oil seals. There is no evidence Garlock knew Mao Shun's formula for its standard brown viton and specifically requested it based on that knowledge. Brown was simply the standard color used for viton for identification purposes.

Contrary to Mao Shun's claim that Garlock specified Mao Shun's standard brown viton "with full knowledge of the problems that Rockwell was experiencing," the evidence, which Mao Shun does not fully or adequately summarize, shows the leakages reported to Garlock in the second quarter of 1998, for the very small number of brown viton seals that were in use at that time, were not chronic or widespread. There is no evidence Garlock or anyone else had knowledge that such leakages related to the iron oxide pigment used by Mao Shun in its standard brown viton. Indeed, even when catastrophic leakage rates were subsequently experienced, it took multiple engineers at Rockwell and Garlock, plus specialized laboratory tests, to isolate the pigment as the source of the problem. Garlock did not rely on its own skill, knowledge, and expertise to specify a particular pigment regardless of its fitness for a radial lip-type oil seal purpose.[6] Thus, the RA-37 specification is not inconsistent with an implied warranty of merchantability.

---

[6] Mao Shun claims the trial court made a finding of fact that Garlock did not rely on Mao Shun's skill or judgment to select or furnish suitable seals. Mao Shun takes such finding out of its context, which was in the trial court's conclusions regarding the implied warranty of fitness for a particular purpose. When read in context, it is clear the trial court found only that Garlock did not rely on Mao Shun's skill or judgment to select or furnish seals suitable for Rockwell's specific purpose. Such finding does not equate to a finding Garlock did not rely on Mao Shun's skill or judgment in determining an appropriate formula for the brown viton.

*Pellegrin, supra,* 237 Cal.App.2d 35, is inapposite. In *Pellegrin* the purchaser gave the manufacturer a written order for wire that specified a particular chemical analysis for the wire. (*Id.* at p. 37.) In that context, the court reasoned there was no implied warranty " 'that [the wire was] adequate for the buyer's purpose, or even for the general purpose for which such things are designed.' " (*Id.* at p. 38.) The situation is different in this case where Garlock did not specify the particular chemical composition of the viton or the specific iron oxide to be used as pigment.[7]

RA-37 did not supplant the implied warranty of merchantability.

**B. *Section 2316, Subdivision (3)(b), the Exclusion or Modification of Warranties, Does Not Preclude the Warranty***

A warranty of merchantability is implied in every contract for the sale of goods if the seller is a merchant with respect to goods of that kind, unless it is excluded or modified as provided in section 2316. (§ 2314, subd. (1).) Mao Shun argues section 2316, subdivision (3)(b), excluded the warranty of merchantability in this case. Such section provides: "When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him . . . ."[8] (§ 2316, subd. (3)(b).)

The trial court concluded the implied warranty of merchantability was not excluded under section 2316, subdivision (3)(b) because it found the latent abrasive characteristics of the oil seals was not "a defect that was, or ought to have been, revealed to Garlock under the circumstances or prevailing testing methodologies." (Capitalization omitted.)

Mao Shun takes issue with this finding, contending Garlock was a professional buyer who should have performed functional testing on the sample

---

[7] In its reply brief, Mao Shun contends displacement of an implied warranty by an express warranty should not be limited to the situation where every component part and every ingredient used to make every component part is specified. We do not so limit the rule. We only conclude that where a buyer specifies a standard component with no knowledge of its ingredients and no reason to know of any potential flaws in such ingredients, its specification of the standard component is not inconsistent with an implied warranty of merchantability by the seller of that component.

[8] Mao Shun's opening brief does not correctly quote section 2316, subdivision (3)(b). Instead, Mao Shun quotes a portion of comment 8 of the Uniform Commercial Code comment and represents it is the language of section 2316, subdivision (3)(b). Intentionally misciting and misquoting authorities is contrary to the California Rules of Professional Conduct. (Rules Prof. Conduct, rule 5-200(C).) Although we will assume the miscite/misquote in Mao Shun's brief was not intentional, it cannot be condoned.

seals provided by Mao Shun, which functional testing would have revealed the abrasive lip problem. Although Mao Shun presents its argument as being one of preclusion as a matter of law, its claim is essentially a challenge to the sufficiency of the evidence supporting the trial court's finding that the abrasiveness of the oil seal lips was not a defect that Garlock ought to have discovered. (*Wickham v. Southland Corp.* (1985) 168 Cal.App.3d 49, 54 [213 Cal.Rptr. 825] [contention that evidence establishes a particular fact as a matter of law when the fact finder has determined the fact to the contrary is but another way of asserting insufficiency of the evidence to support the finding].)

Where the appellant challenges the sufficiency of the evidence, the reviewing court starts with the presumption that the record contains evidence sufficient to support the judgment; it is the appellant's affirmative burden to demonstrate otherwise. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362] (*Foreman & Clark*); *Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368 [15 Cal.Rptr.3d 430].) The appellant's brief must set forth *all* of the material evidence bearing on the issue, not merely the evidence favorable to the appellant, and must show how the evidence does not sustain the challenged finding. (*Foreman & Clark, supra*, at p. 881; *Baxter Healthcare Corp. v. Denton, supra*, at p. 368.) If the appellant fails to set forth all of the material evidence, its claim of insufficiency of the evidence is forfeited. (*Foreman & Clark, supra*, at p. 881; *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 782 [125 Cal.Rptr.2d 804].)

Furthermore, "[i]n reviewing the sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prevailing party, accept as true all the evidence and reasonable inferences therefrom that tend to establish the correctness of the trial court's findings and decision, and resolve every conflict in favor of the judgment. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631 [85 Cal.Rptr.2d 386].) 'It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment.' (*Ibid.*)" (*Baxter Healthcare Corp. v. Denton, supra*, 120 Cal.App.4th at p. 369, italics omitted.)

Mao Shun fails to set forth all of the material evidence relevant to the question of whether Garlock should have discovered the latent problem with the abrasiveness of the oil seal lips. Indeed, Mao Shun not only cites just the evidence in its favor, it takes much of such evidence out of context, thereby misrepresenting the actual substance of the testimony. For example, Mao Shun claims Rockwell's gear engineering manager Pizzichil testified, "functional testing should always be done when determining the applicability of an

oil seal in a particular application." In fact, at the portion of his testimony to which Mao Shun cites, Pizzichil was testifying regarding testing Rockwell did for a subsequent generation of gear reducer oil seals and an article he wrote *after* Rockwell's experience with the brown viton oil seals at issue in this case. The fact Rockwell learned from their experience with the Mao Shun brown viton seals is not the same as testimony that functional testing should have been done by Garlock back in 1998. Similarly, Mao Shun represents that Garlock's manager of engineering, James Drago, testified Garlock "normally" did functional testing and maintained a functional testing lab for precisely this reason. In fact, Drago testified Garlock would do functional testing only for a newly configured component with a new compound. As Garlock considered the radial lip-type seals proposed in the summer of 1998 to be a standard design configuration not made with a new compound, Garlock did not feel functional testing was required.[9]

Mao Shun's failure to fully and accurately summarize the material evidence on this issue forfeits the claim on appeal, which in any event, is meritless.

Substantial evidence established Garlock tested the Mao Shun sample seals for purposes of ensuring they were the proper configuration, dimension, and otherwise met specification requirements and that Garlock did the normal ASTM tests to check the basic physical properties of the rubber compound. The seals met specifications and passed the standard ASTM tests. Garlock gave a reasonable explanation of why it did not do any functional testing of the samples. Drago specifically testified Garlock had no reason to suspect Mao Shun's brown viton seals contained abrasives, which testimony is circumstantially supported by the extraordinary testing later required to isolate the pigment problem. Garlock's notice in the second quarter of 1998 of some unexplained leakage problems with the small number of brown viton seals then in use does not require a finding to the contrary.

Substantial evidence supports the trial court's finding that the abrasiveness of the oil seal lips was not a defect that Garlock ought to have discovered. Section 2316, subdivision (3)(b), therefore, did not exclude the implied warranty of merchantability.

---

[9] Mao Shun contends functional testing was required because the trial court described the oil seal as a "newly designed" "custom manufactured" radial lip-type oil seal, citing the trial court's statement of decision. Again, Mao Shun takes these terms out of context. A review of the statement of decision shows the trial court was not using these terms in connection with any consideration of functional testing, but was using the terms to distinguish these oil seals from a standard "off-the-shelf" product. The fact the seals were designed and manufactured specifically for Garlock does not mean they are not a standard design configuration.

## II.

### Substantial Evidence Supports the Trial Court's Finding Mao Shun Breached Section 2314, the Implied Warranty of Merchantability

Mao Shun contends that, "even if the implied warranty of merchantability were not precluded as a matter of law, the trial court's finding that Mao Shun breached the implied warranty is erroneous as a matter of law based upon the trial court's findings of fact." (Capitalization omitted.) Mao Shun argues the trial court's findings of fact "preclude a conclusion of law that the oil seals at issue were not 'fit for the ordinary purposes for which such goods are used.' "[10] Mao Shun contends the seals "were not used in their ordinary course."[11] In its reply brief, Mao Shun argues there is not substantial evidence to support the finding of breach of the implied warranty because Garlock has failed to identify the evidence supporting the trial court's conclusion of breach and, going back to its original theme, there is evidence that shows the seals did not fail in ordinary use, but in Rockwell's particular use.

Although Mao Shun initially frames this issue as one of inconsistency of the trial court's findings with its conclusion of law, at its heart, this issue is a challenge to the sufficiency of the evidence of breach. As such, it is Mao Shun's obligation as appellant, not Garlock's, " 'to demonstrate that there is *no* substantial evidence to support the challenged findings.' [Citations.] A recitation of only [appellant's] evidence is not the 'demonstration' contemplated under the above rule. [Citation.]" (*Foreman & Clark, supra,* 3 Cal.3d at p. 881, italics added by *Foreman.*)

Mao Shun does not set forth all the material evidence and totally ignores the trial court's specific findings that Rockwell's application of Mao Shun's brown viton seals "was not unusual or extraordinary. The application presented no exceptional factors in terms of size of the seal, speed of the shaft, shaft material or hardness, temperature, lubricant type, environment or operational durability requirements. To the contrary, the seals at issue were employed in an ordinary manner, within ordinary parameters, and for their ordinary purpose." According to the trial court, "[d]ue to the extraordinary abrasiveness of the Mao Shun oil seals resulting in damage to the gear

---

[10] Mao Shun cites the trial court's findings that the oil seals at issue were "custom manufactured" and "newly designed" for "two specific applications," which were the only applications that experienced any problems, along with the trial court's consideration of six areas of evidence generally regarding Mao Shun's lack of knowledge of the potential problem, its quality control procedures and testing.

[11] Mao Shun points basically to the same findings of fact.

reducer shafts and accelerated exhaustion of the seals['] effectiveness, . . . the seals were not 'fit for the ordinary purposes for which such goods are used' as required under . . . section 2314[, subdivision] (2)(c)." (Capitalization omitted.) Mao Shun has not shown these findings are not supported by substantial evidence; Mao Shun argues only its interpretation of portions of the evidence and picks out isolated phrases of the statement of decision favorable to its position.

We are required, however, to " 'start[] with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.]" (*Foreman & Clark, supra*, 3 Cal.3d at p. 881.) And indeed, in this case it does. As the trial court noted, "[i]f . . . goods contain an impurity of such a nature as to render them unusable, and therefore unsaleable, for the general uses and purposes of goods of the kind described, the goods are not merchantable." (*Burr v. Sherwin Williams Co.* (1954) 42 Cal.2d 682, 694 [268 P.2d 1041].) The goods must be "fit for the ordinary purposes for which such goods are used." (§ 2314, subd. (2)(c).) Evidence was submitted at trial that the selection of a radial lip-type oil seal made from viton was an appropriate selection for the gearbox application of Rockwell based on consideration of shaft speed, size compatibility, and heat tolerance. The operating conditions for Rockwell's use of the seals were not unusual or excessive for viton seals. It was a typical application, even if specially designed for Rockwell. A viton polymer properly formulated should have been able to handle the application easily. However, almost 30 percent of the Mao Shun brown viton radial lip-type oil seals leaked. This was considered a catastrophic leakage rate in the industry. Garlock's expert, Leslie Horve, stated that one of the purposes of oil seals is to prevent premature oil leakage and when a seal experiences premature leakage it has not performed its intended purpose and has failed. When Rockwell replaced all brown viton seals with green viton seals, the leakage rate immediately went down to 1 or 2 percent and there was no shaft grooving.

The trial court's conclusion that Mao Shun breached the implied warranty of merchantability was supported by both substantial evidence and its express findings of fact.

## III.

### The Trial Court's Award of Damages for the Breach of the Implied Warranty of Merchantability

The trial court awarded consequential damages to Garlock, concluding "[t]he type of damage caused to Rockwell's products by Mao Shun's seals,

and Rockwell's necessary response to its customer's directly resulting complaints and demands, was a reasonably foreseeable and probable result of Mao Shun's breach of the warranty of merchantability." (Capitalization omitted.)

Mao Shun attacks the trial court's award to Garlock of consequential damages and contends Garlock obtained the standard remedy for breach of a warranty when prior to any litigation Mao Shun provided replacement seals at no charge. Mao Shun also contends the award of additional consequential damages under section 2715, subdivision (2), was not proper as the damages were not reasonably foreseeable, were not supported by substantial evidence, and included damages related to oil seals purchased outside the statute of limitations period and used after Garlock had actual notice of the alleged defect. We consider each of these claims in turn.

A. *Reasonable Foreseeability of Consequential Damages*

Section 2714, subdivision (2) (buyer's damages for breach in regard to accepted goods), provides: "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, *unless special circumstances show proximate damages of a different amount.*" (Italics added.) "Consequential damages resulting from the seller's breach include [¶] (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and [¶] (b) Injury to person or property proximately resulting from any breach of warranty." (§ 2715, subd. (2) [buyer's incidental and consequential damages].)

Mao Shun contends Garlock received the value of the goods as warranted when it provided replacements for the brown viton seals without charge (§ 2714, subd. (2)) and that any further consequential damages for the cost to replace complete gear reducers were not reasonably foreseeable by Mao Shun. (§ 2715, subd. (2)(a).)

Garlock contends, however, substantial evidence supports the award of consequential damages under section 2715, subdivision (2)(b), for damages from injury to property proximately resulting from Mao Shun's breach of warranty and suggests Mao Shun's foreseeability arguments should be considered under the rubric of whether Mao Shun has shown "these other alleged 'superseding causes' eliminate its liability as a matter of law." (See *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1030–1031 [47 Cal.Rptr.2d 348] [considering the interplay of the rules of intervening and superseding causes in the

concept of foreseeability of tort damages]; *Mosley v. Arden Farms Co.* (1945) 26 Cal.2d 213, 218 [157 P.2d 372] [intervening agency ·not a superseding cause in tort àction].)

Mao Shun does not provide any legal analysis in its briefs of section 2715, subdivision (2)(b), does not address Garlock's claim that the evidence established Mao Shun's brown viton oil seals were a substantial factor in damaging, i.e., proximately causing the damage to, Rockwell's gear reducer shafts, and does not address Garlock's analysis of its foreseeability arguments as "superseding causes." ·

Mao Shun complains Garlock had knowledge of leakage problems as early as 1997 and that it was not reasonably foreseeable Garlock would fail to disclose this information to Sunrise Trading or Mao Shun and would continue to sell brown viton oil seals to Rockwell when it knew they were failing. Mao Shun contends: (1) it was not reasonably foreseeable it would be responsible for an alleged defect when it manufactured the seals in compliance with the RA-37 specification; (2) it was not reasonably foreseeable Garlock would fail to do appropriate testing of the .seals; (3) it was not reasonably foreseeable Garlock would continue to use the seals when it knew they were not working in the Rockwell applications; (4) it was not reasonably foreseeable the failure of a $1 oil seal would lead to replacement of a $400 gear reducer given the lack of any prior complaints or concerns about the abrasiveness of Mao Shun's seals; and, (5) it was not reasonably foreseeable Garlock would include broad express warranties in its contract with Rockwell and then try to attempt to hold Mao Shun responsible for damages stemming from those obligations.

We need not consider Garlock's claim that damages were properly awarded under section 2715, subdivision (2)(b), nor whether superseding cause analysis is applicable in this contractual breach of warranty. setting because we conclude Mao Shun has not met its burden to show substantial evidence does not support the trial court's finding of reasonable foreseeability. Mao Shun has not shown the award of consequential damages under section 2715, subdivision (2)(a), was improper.

Under section 2715, subdivision (2)(a), consequential damages include any loss "resulting from general or particular requirements and needs of which the seller at the time of contracting *had reason to know* and which could not reasonably be prevented by cover or otherwise." (Italics added.)

. ■ " 'It is often said that damages must be "foreseeable" to be recoverable for breach of contract. The seminal case announcing this doctrine, still generally accepted as a limitation on damages recoverable for breach of

contract, is *Hadley* v. *Baxendale* (1854) 156 Eng.Rep. 145.' " (*Resort Video, Ltd.* v. *Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1697 [42 Cal.Rptr.2d 136], quoting *Brandon & Tibbs* v. *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455–456 [277 Cal.Rptr. 40].) The "reason to know" language of section 2715, subdivision (2)(a) incorporates the *Hadley* v. *Baxendale* limitation. (*Sun-Maid Raisin Growers* v. *Victor Packing Co.* (1983) 146 Cal.App.3d 787, 791 [194 Cal.Rptr. 612].) "The code, however, has imposed an objective rather than a subjective standard in determining whether the seller should have anticipated the buyer's needs. Thus, actual knowledge by the seller of the buyer's requirements is not required. The only requirement under section 2715, subdivision (2)(a), is that the seller reasonably should have been expected to know of the buyer's exposure to loss." (*Ibid.*) This issue, unless it can be ruled on as a matter of law, "is one of fact to be determined by the trier of fact. [Citation.] If supported by the evidence, the decision cannot be overturned on appeal." (*Id.* at p. 790.)

Again we note, although the issue raised by Mao Shun involves an application of the substantial evidence standard, Mao Shun has failed to summarize all the material evidence and argue how it fails to support the trial court's decision. Mao Shun does not show it should not have been expected to know Garlock would be exposed to loss, through Rockwell's complaints and demands for replacement costs of the damaged gearboxes, if the brown viton seals sold by Mao Shun were unmerchantable because of the abrasiveness of the pigment. Mao Shun does not show how it was unreasonable to expect it to know of Garlock's exposure to loss—it simply argues its view of the evidence.

Thus, Mao Shun complains Garlock had knowledge of leakage problems as early as 1997 and that it was not reasonably foreseeable Garlock would fail to disclose this information to Sunrise Trading or Mao Shun and would continue to sell brown viton oil seals to Rockwell when it knew they were failing. Actually, the evidence shows Garlock had knowledge of the *nitrile* oil seals leaking in 1997 and may have had some knowledge of a small number of gear reducer units with brown viton oil seals leaking by the second quarter of 1998, but there is no evidence Garlock knew the cause of the leakage problems or that it continued to sell the seals to Rockwell after it knew the cause of the leakage problem and had an available alternative. In fact, Mao Shun's argument really goes to whether Garlock could have prevented or limited the loss, but, as we have already discussed, substantial evidence supports the trial court's finding that the abrasiveness of the oil seal lips was not a defect that Garlock ought to have discovered in 1997 or 1998. There was evidence that Garlock continued to sell Rockwell the brown viton seals once it was known they were defective only because there was no other available material for the seals and Rockwell still needed to meet its

customers' needs. And the evidence showed that Garlock did so only until the green viton seal replacements were available.

Mao Shun's arguments that it was not reasonably foreseeable it would be responsible for an alleged defect when it manufactured the seals in compliance with the RA-37 specification and that it was not reasonably foreseeable Garlock would fail to do appropriate testing are a reprise of its claims that it should not be responsible for an implied warranty of merchantability in this case. These arguments do not establish Mao Shun could not have reasonably foreseen Garlock's loss if it breached the warranty of merchantability.

Mao Shun claims it was not reasonably foreseeable the failure of a $1 oil seal would lead to replacement of a $400 gear reducer given the lack of any prior complaints or concerns about the abrasiveness of Mao Shun's seals. On the contrary, as a longtime manufacturer of oil seals, Mao Shun should have known a radial lip-type oil seal is intended to ride on a rotating shaft so as to seal lubrication in and contaminants out. Thus, it would have understood the seal could not be used without being incorporated into other machinery, which could be damaged and require replacement if the seal abraded the shaft on which it was set. The lack of prior complaints or concerns about the abrasiveness of its seals is evidence Mao Shun did not have prior actual knowledge of the abrasiveness of its brown viton seals. However, the lack of prior complaints and the lack of prior actual knowledge of the abrasiveness of the brown viton seal does not establish Mao Shun did not have reason to know at the time of contracting that its oil seals should not include abrasive materials and that if they did, substantial property damage to the equipment in which they were installed could follow.

Finally, Mao Shun argues it was not reasonably foreseeable Garlock would include broad express warranties in its contract with Rockwell and then try to attempt to hold Mao Shun responsible for damages stemming from those obligations. It is true Rockwell's purchase order to Garlock contained express, as well as implied, seller warranties, but the existence of warranties in the Garlock/Rockwell contract beyond the implied warranty of merchantability did not make the Mao Shun brown viton oil seals any less defective and more merchantable. Based solely on the abrasiveness of the brown viton oil seal Mao Shun manufactured which Garlock supplied to Rockwell, Garlock breached the implied warranty of merchantability it gave to Rockwell and no resort to any further or additional warranties would have been necessary for Garlock to have been liable to Rockwell in the federal lawsuit for the damages caused by its breach.

B. *Substantial Evidence to Support the Award of Consequential Damages*

The trial court concluded Garlock had proved recoverable consequential damages in the amount of $1,678,267. The statement of decision explains how the court arrived at this figure as follows: "Garlock demonstrated that there existed a high probability that Rockwell would recover $2,176,556.00 in damages against Garlock for the Mao Shun seal failure. This figure is composed of $1,892,882.00 'costs of replacement' (not including Rockwell's airfare, travel, 'other' labor, lost profits, or attorney's fees), and interest upon that amount at 10% for a period of 18 months in the amount of $283,673.00. This figure constitutes 73.79% of the total figure of $2,949,418.00 which was characterized by Garlock as the 'high probability' Rockwell damage risk, a figure used by Garlock to calculate its ultimate settlement with Rockwell. Garlock paid Rockwell $2,274,383.00 to settle the parties' dispute (the court values the product discounts, incurred or anticipated, at $74,383.00). The sum of $1,678,267.00 represents the percentage of Garlock's actual settlement payment that corresponds to the portion of Rockwell's damages, the recovery of which was highly probable and sufficiently established by the evidence at trial." (Capitalization omitted.)

The trial court's figures are drawn directly from exhibit H to the damages summary prepared by James Skorheim, Garlock's accounting expert, who testified at trial regarding Garlock's economic losses from its dispute with Rockwell regarding the defects in the brown viton seals produced by Mao Shun. The figures are fully supported by Skorheim's testimony and supporting documentation to his summary.

Nevertheless, Mao Shun claims on appeal the award of damages is not supported by substantial evidence. Mao Shun contends the "trial court's calculation of damages erroneously focuses on the reasonableness of Garlock's settlement with Rockwell in light of the testimony of its expert [Skorheim] regarding the probability of incurring an adverse judgment at various monetary levels." (Capitalization omitted.) Mao Shun claims this was legal error because the proper analysis is whether Garlock proved the damages were proximately caused by Mao Shun's purported breach of the implied warranty of merchantability. Mao Shun claims Garlock did not meet this burden and there is not substantial evidence to support the award. Mao Shun claims the trial evidence is clear Garlock's liability to Rockwell stemmed from the broad express warranty and separate indemnification provision in its contract with Rockwell.

Mao Shun's argument is based on the flawed premise that Garlock's liability to Rockwell was not based on Garlock's [Mao Shun's] breach of the implied warranty of merchantability. In fact, the evidence shows Skorheim

calculated his estimates of Garlock's probability of loss from the "deficiencies and defects in the brown Viton oil seal produced by Mao Shun." John Mayo, legal counsel for Garlock at the time of its settlement with Rockwell, testified he negotiated and recommended Garlock's settlement of the lawsuit for a total of $2.88 million, which was below the low end of his estimation of Garlock's liability. Mayo admitted part of his analysis in recommending settlement was the applicability of the terms and conditions in Garlock's contract with Rockwell, but such terms and conditions specifically contained a warranty "that all goods covered by this order are merchantable, free from defects in design, material and workmanship." Mayo was concerned Rockwell would win the case against Garlock if it went to trial. And, as we have already noted, given the conclusion the Mao Shun oil seals were not merchantable, Garlock would have been liable to Rockwell for the breach of such implied warranty regardless of whether additional warranties existed.

The trial court's damage award is supported by substantial evidence.

### C. Damages for Oil Seals Purchased Outside the Statute of Limitations Period

Mao Shun claims the consequential damages awarded by the trial court improperly included replacement costs related to oil seals purchased outside the statute of limitations period.[12] Mao Shun points to testimony by Bushey, Rockwell's warranty administrator, regarding Rockwell's purchase of brown viton oil seals starting in 1997 and her knowledge of warranty claims for leaking gear reducers in 1997. What Mao Shun fails to do, however, is to connect such testimony to the trial court's award of consequential damages.

The trial court did not award consequential damages for all the costs of replacement incurred by Rockwell. The trial court awarded as damages a *percentage* of Garlock's settlement payment "that corresponds to the *portion* of Rockwell's damages, the recovery of which was highly probable and sufficiently established by the evidence at trial." (Italics added.) The damage figures from which such percentage was derived were taken from Skorheim's calculation of Garlock's economic losses from the dispute with Rockwell. Such damage figures were themselves a product of a percentage of probability that a jury would have awarded Rockwell those damages against Garlock if the case had gone to trial. That is, the damage figures were a *portion* of Rockwell's damages, but we do not know which portion.

In these circumstances, we cannot say the award of consequential damages as calculated by the trial court contained any damages for replacement costs

---

[12] Section 2725 provides a four-year statute of limitations for an action for breach of any contract for sale. (§ 2725, subd. (1).) Garlock filed this action on October 4, 2002.

related to oil seals purchased more than four years before the filing of this action. Mao Shun has not established any error.[13]

### D. Damages for Oil Seals Used After Garlock and Rockwell Had Notice of the Alleged Defect

Mao Shun claims the consequential damages awarded by the trial court improperly included replacement costs related to oil seals used after Garlock and Rockwell had actual knowledge of problems with the brown viton oil seals. Mao Shun argues such use of its seals after notice of the problem was a "failure to mitigate if not an outright assumption of the risk." Accordingly, such replacement costs should not be included in any damages award. We disagree.

We view the evidence "in the light most favorable to the prevailing party, accept as true all the evidence and reasonable inferences therefrom that tend to establish the correctness of the trial court's findings and decision, and resolve every conflict in favor of the judgment. [Citation.]" (*Baxter Healthcare Corp. v. Denton, supra*, 120 Cal.App.4th at p. 369.) The record here contains evidence that Garlock and Rockwell had no choice other than to use the defective seals until the precise cause of the leakage problem was identified and an alternative material was found. Rockwell could not just stop supplying its customer's needs. It would be responsible for the customer's losses and would lose customers. In such circumstances, there was no failure to mitigate or assumption of the risk. The trial court was not required to exclude from its damages calculation replacement costs attributable to seals used after notice of the problem.

### E. The Effect of the Number of Gear Reducers Examined on the Award of Damages

In its reply brief Mao Shun raises for the first time a claim Garlock and Rockwell examined a statistically insignificant number of gear reducers to support the replacement costs on which the trial court relied for its award of consequential damages.

We will not consider points raised for the first time in an appellant's reply brief, unless good reason is shown for the failure to present them earlier. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Mao Shun has made no such showing.

---

[13] Given this resolution of the issue, we need not consider Garlock's responsive argument that no portion of its cause of action was barred by the statute of limitations, since the statute of limitations did not start under section 2725, subdivision (2), until Garlock's discovery of the breach of warranty.

## IV.

### Sunrise Trading Was Mao Shun's Agent

#### A. *Factual Background*

Dr. Ping-Chi Mao started Sunrise Trading as an import/export business in 1973. Initially he thought he would import gift items. He bought and imported wind chimes, but as he did not have any contacts for the sale of the chimes, he ended up trying to get rid of the chimes at Denio's Sunday Market, a flea market in Roseville. It took him years to sell all of the chimes. After that experience, Mao gave up on purchasing and importing items to sell in the United States. He decided it would be better to provide service as an American agent for an Asian company.

In 1981, after Mao gave a speech for the Sacramento Chamber of Commerce regarding trade with Taiwan, he was contacted by Mao Shun. Mao met with Joseph Shek, the president of Mao Shun, and Jensen Chen, the general manager of Mao Shun. Shek and Chen told Mao they wanted to sell Mao Shun products in the United States and they needed an agent to find buyers and take care of the language problem. When Mao told them he had no knowledge of their products and could not buy their products, Shek and Chen assured him he did not need to worry. Mao Shun would be responsible for explaining their merchandise and would take care of all quality issues. Mao emphasized he had no knowledge of oil seals. He could only act as an agent, as a facilitator. Shek and Chen told Mao that Mao Shun would be 100 percent responsible for quality and liability. They just needed Mao to be their agent. Mao, Shek and Chen signed an agreement that day, written in Chinese, to set up their relationship. The agreement stated in part: "Ping-Chi Mao, of Sunrise Trading Company, will be the representative of Mao Shun in the United States. The responsibility for Sunrise Trading Company is to help promote the merchandise . . . produced by Mao Shun Company and help to secure the orders and ship and merchandise will be directly shipped out from Mao Shun." The same word is used in Chinese for "agent" or "representative." The agreement provided for Mao Shun to pay Sunrise Trading a base 5 percent commission for its sales.

After signing the agreement, Sunrise Trading sent out promotional fliers for Mao Shun products. Garlock subsequently contacted Sunrise Trading regarding purchasing Mao Shun oil seals. A Garlock representative came to Sacramento to meet with Mao and Mao's assistant, April Chi. Following that meeting, Mao set up a meeting between Shek and Chen of Mao Shun and Garlock representatives at Garlock's offices in New York state. At that meeting in New York, Mao explained Sunrise Trading was the agent for Mao Shun.

James Cook, an employee of Garlock, then went to Taiwan to see the Mao Shun facilities. Garlock placed a trial piece of business with Mao Shun and then started placing further orders for oil seals. Cook testified he was told Mao Shun would do business through Sunrise Trading. Sunrise Trading was essentially a sales office of Mao Shun. Sunrise Trading was Mao Shun's agent.

Cook was the person from Garlock having personal contact with Sunrise Trading and Mao Shun until 1988, when he changed positions. Cook testified the only written contracts between Garlock and Mao Shun were the purchase orders. Each purchase order would govern the material in that order.

Sunrise Trading and Mao Shun operated under their original agreement without any amendment between 1981 and 1986. In 1986, Cook talked to Chi about Garlock increasing its volume of orders from Mao Shun. Garlock wanted to stop using expensive air freight and use ocean shipping. Cook asked Sunrise Trading if they would be able to assist. Chi discussed the proposed change in shipping with either Shek or Chen. To use ocean shipping, Sunrise Trading had to pick up the products from Oakland, pay the customs charges, and arrange for a freight forwarder. Mao Shun authorized Sunrise Trading to add an additional percentage to the product price to cover Sunrise Trading's additional costs. The total standard markup became 28 percent. It was agreed Sunrise Trading could start taking shipments into the United States for Garlock.

Mao Shun never told Chi the change in procedure made Sunrise Trading the seller of the oil seals. There was no new agreement written between Sunrise Trading and Mao Shun. Mao testified Sunrise Trading and Mao Shun were still operating under the 1981 agreement except for an oral understanding that there was a change in Sunrise Trading's compensation. Mao understood Sunrise Trading was still acting as the representative of Mao Shun. There was simply a change in the process to save Garlock costs made at the request of both Garlock and Mao Shun. Mao Shun would ship to Sunrise Trading, who would receive the product, clear customs and then ship it to Garlock. According to Chi, the purpose of the change was administrative efficiency.

Darin Thibideau was in charge of day-to-day operations for Sunrise Trading in 1997, 1998 and 1999. He was told when he was hired that the nature of Sunrise Trading's work was managing the flow of communications and products between Mao Shun and its customers in the United States. Thibideau understood Sunrise Trading was acting as an agent for Mao Shun. No one with Mao Shun ever told him Mao Shun considered Garlock to be Sunrise Trading's customer.

Thibideau described the procedure for processing a Garlock order. Garlock would fax a purchase order to Sunrise Trading. On the basis of the fax, Thibideau would generate a Sunrise Trading purchase order that he would fax to Mao Shun. Mao Shun would confirm Sunrise Trading's purchase order by hand notation on the purchase order form, which would be faxed back to Sunrise Trading. Sunrise Trading would then transmit an "order confirmation form" to Garlock. At a later date Garlock would send Sunrise Trading a hard copy of its faxed purchase order. The underlying agreement between Sunrise Trading and Mao Shun was that Sunrise Trading would make payment to Mao Shun only upon receipt of payment from Garlock. Thibideau could not remember a time when Garlock was late in its payment and Mao Shun nevertheless demanded payment from Sunrise Trading.

. Thibideau testified Sunrise Trading never offered warranties or limitations on Mao Shun products because Mao Shun, not Sunrise Trading, was the warrantor. When a common warranty question arose, he would communicate it to Mao Shun and await their instructions.

Joseph Shek, president of Mao Shun, testified Mao Shun's agreement with Sunrise Trading changed in 1986 or 1987. Before such change, Sunrise Trading was compensated on a commission basis. After the change, the parties dealt on a quoting basis, i.e., Mao Shun would give a quote and Sunrise Trading would place an order. Sunrise Trading would ship the products and Mao Shun would receive payment from Sunrise Trading. After the change in the agreement, Mao Shun always sold directly to Sunrise Trading. After the change Mao Shun did not have an agreement with Sunrise Trading that limited who Sunrise Trading could buy seals from or whom they could sell them to in the United States. Mao Shun did not know the price Sunrise Trading charged for the seals. Shek had never authorized anyone at Sunrise Trading to enter into an agreement on behalf of Mao Shun.

## B. Actual Agency

█ " 'The essential characteristics of an agency relationship as laid out in the Restatement are as follows: (1) An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him. [Citation.]' (*Alvarez* v. *Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999 [41 Cal.Rptr. 514]; see also Civ. Code, § 2295 ['An agent is one who represents another, called the principal, in dealings with. third persons'].)" (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1868–1869 [37 Cal.Rptr.2d 63].)

■ In the situation where goods pass from a manufacturer to another party for resale to a third person, the Restatement adds the following: "One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction: whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of the one delivering the goods to him or is to act primarily for his own benefit." (Rest.2d Agency, § 14J; see 2 Cal.Jur.3d (1997) Agency, § 5.)

After noting this law, the trial court considered eight factors relevant to determining whether a company that receives goods for resale is an agent or buyer of the manufacturer. The eight factors were "whether the company: (1) obtains legal title and possession of the goods; (2) deals with the purchaser of the goods in its own name and does not disclose that the goods are those of another; (3) bears the risk of accident or casualty to the goods; (4) can fix the price at which it sells the goods without accounting to the manufacturer for the difference between what it obtains and the price it pays; (5) has the right to purchase goods of another manufacturer; (6) must pay for the goods regardless of whether it can resell them; (7) receives a commission for its services in reselling the goods; and (8) is obligated to complete preparation or manufacture of the goods." After considering the evidence in light of these factors, the trial court came to the conclusion the relationship between Mao Shun and Sunrise Trading was one of agency. According to the trial court, "the essential facts of the parties' relationship demonstrate that [Sunrise Trading's] duty was primarily to act for the benefit of Mao Shun, not itself, in its transactions with Garlock." (Capitalization omitted.)

The existence of an agency relationship is a factual question for the trier of fact, whose determination must be affirmed on appeal if supported by substantial evidence. (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619 [20 Cal.Rptr.2d 358]; *Inglewood Teachers Assn. v. Public Employment Relations Bd.* (1991) 227 Cal.App.3d 767, 780 [278 Cal.Rptr. 228]; *Wickham v. Southland Corp., supra*, 168 Cal.App.3d at p. 55.) "Only when the essential facts are not in conflict will an agency determination be made as a matter of law." (*Wickham v. Southland Corp., supra*, at p. 55; see *Violette v. Shoup, supra*, at p. 619.)

Mao Shun contends the trial court incorrectly applied the law to the facts in concluding Sunrise Trading was entitled to indemnity because it was Mao Shun's agent. Mao Shun claims the trial court gave undue weight to conduct that occurred prior to the 1986 modifications to the 1981 agreement. Mao Shun then reanalyzes the eight factors considered by the trial court in the

light of evidence favorable to it and argues the factors "mandate" a finding there was no agency relationship between Mao Shun and Sunrise Trading.[14]

Mao Shun's argument ignores the well-settled rules regarding appellate review for sufficiency of the evidence, which we have already summarized. Mao Shun's complaint that the trial court gave undue weight to some of the evidence asks this court to reweigh the evidence, which we may not do. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834].) Even more fundamentally, it is Mao Shun's burden as appellant to set forth *all* of the material evidence, not merely the evidence favorable to it, and to show how the evidence is insufficient to support the challenged finding. (*Foreman & Clark, supra,* 3 Cal.3d at p. 881; *Baxter Healthcare Corp. v. Denton, supra,* 120 Cal.App.4th at p. 368.) This is not what Mao Shun has done. Mao Shun has, therefore, forfeited its sufficiency of the evidence challenge to the trial court's agency finding. (*Foreman & Clark, supra,* at p. 881; *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc., supra,* 102 Cal.App.4th at p. 782.)

Mao Shun's argument is also meritless. Our summary of the evidence amply demonstrates substantial evidence to support the trial court's finding of agency. There was considerable evidence the parties agreed to an express agency relationship in 1981 that was not changed by the amendments in 1986, which were made to accommodate Garlock's interest in having Mao Shun's product shipped by a less expensive method. A consideration of the evidence, in the light most favorable to the judgment as required on appeal, establishes Sunrise Trading's duty was to act primarily for the benefit of Mao Shun, rather than itself, in its transactions with Garlock. (Rest.2d Agency, § 14J.)

## C. *Ostensible Agency*

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Civ. Code, § 2317.)

---

[14] We note Mao Shun misstates the evidence it relies upon regarding factors 5 and 6. As to factor 5, the evidence does not establish Sunrise Trading had the right to purchase the goods of other manufacturers, only that it could sell the goods of Mao Shun to other customers. As to factor 6, the evidence does not establish Sunrise Trading had to pay for the oil seals it bought from Mao Shun regardless whether it sold them. Mao and Thibideau actually testified Sunrise Trading would make payment to Mao Shun only upon receipt of payment from Garlock. Such misstatements of the evidence are unfair to both the opposing parties and this court as it takes time and resources to check and correct the misstatements.

The trial court found that even if the relationship between Mao Shun and Sunrise Trading was not one of actual agency, there was an ostensible agency as to the transactions with Garlock. Given our conclusion that substantial evidence supports the trial court's finding of actual agency, we do not need to decide Mao Shun's claim on appeal that the trial court's finding of ostensible agency was error.

## V.

### Summary of Our Conclusions on Mao Shun's Appeal

■ We conclude Mao Shun's sale of the brown viton radial lip-type oil seals in this case included an implied warranty of merchantability. The trial court's conclusion that Mao Shun breached the implied warranty of merchantability is supported by both substantial evidence and the trial court's express findings of fact. We reject each of Mao Shun's claims regarding the trial court's award of consequential damages. We conclude substantial evidence supports the trial court's finding that Sunrise Trading was the actual agent of Mao Shun in the transactions with Garlock.

Based on these conclusions, we affirm the trial court's judgment awarding Garlock damages for Mao Shun's breach of the implied warranty of merchantability and ordering Mao Shun to indemnify Sunrise Trading for its costs of defending the Garlock action. We turn to Garlock's appeal.

### GARLOCK'S APPEAL

## VI.

### The Trial Court Erred in Limiting Implied Contractual Indemnity to Cases Involving a Negligent Breach of Contract

■ "Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) It arises from two sources: "First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case. [Citations.]" (*E.L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 506–507 [146 Cal.Rptr. 614, 579 P.2d 505]; see *Bay Development, Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1029 [269 Cal.Rptr. 720, 791 P.2d 290] (*Bay Development*); see *Rossmoor Sanitation, Inc. v. Pylon, Inc., supra,* at p. 628.) Both the latter doctrines of implied indemnity "rest on the equities of the circumstances, i.e., tortfeasors

sharing loss in proportion to their culpability, contracting parties sharing loss relative to their breach." (*Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1736–1737 [286 Cal.Rptr. 435] (*Smoketree-Lake Murray*); see *Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp.* (2003) 111 ·Cal.App.4th 1328, 1350 [4 Cal.Rptr.3d 655].) Implied contractual indemnity is a type of equitable indemnity (*Bay Development, supra,* at p. 1029), predicated on the indemnitor's breach of contract with the indemnitee. (*West v. Superior Court* (1994) 27 Cal.App.4th 1625, 1633 [34 Cal.Rptr.2d 409]; *Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367, 379 [25 Cal.Rptr. 301], disapproved on another point in *Bay Development, supra,* at p. 1029.)

Relying primarily on language found in *Bear Creek Planning Com. v. Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227, 1237 [211 Cal.Rptr. 172] (*Bear Creek*), disapproved on other grounds in *Bay Development, supra,* 50 Cal.3d 1012, 1032 and footnote 12, to the effect that a contractual obligation " 'carries with it an implied agreement to indemnify and to discharge for[e]seeable . . . damages resulting to the plaintiff [indemnitee] from the defendants' [indemnitor's] *negligent performance*' " (italics changed by the trial court), the trial court in this case determined implied contractual indemnity is only available when the indemnitee proves the indemnitor failed "to use reasonable care in performing its· contractual duties owing to plaintiff, and that failure of care was a substantial factor in causing the damages for which the plaintiff seeks indemnification." The trial court concluded Garlock had proved Mao Shun had breached the warranty of merchantability, but had not proved Mao Shun's breach was the result of its failure to use reasonable care in performing its contractual duties. Therefore, the trial court concluded Mao Shun was not liable to Garlock for implied contractual indemnity. Garlock contends the trial court's limitation of the doctrine of implied contractual indemnity to negligent breaches of contract was error. We agree.

It is important to understand some of the historical context of California's recognition of implied contractual indemnity.

The doctrine's first clear recognition in California came in the case of *S. F. Unified Sch. Dist. v. Cal. Bldg. etc. Co.* (1958) 162 Cal.App.2d 434, 449 [328 P.2d 785] (*S. F. Unified Sch. Dist.*). (*Montgomery Ward & Co. v. KPIX Westinghouse Broadcasting Co.* (1962) 198 Cal.App.2d 759, 762 [18 Cal.Rptr. 341].) In *S. F. Unified Sch. Dist.,* the defendant maintenance company had a contract to wash the windows of the plaintiff district's high schools. The contract required that, " 'In all schools that have Hauser window sashes, stepladders must be used from inside' " and " 'the Contractor is held responsible for payment of any and all damages resulting from his operations.' " (162 Cal.App.2d at p. 437.) An employee of the maintenance company was injured while washing a Hauser-type window while not using a stepladder. (*Id.* at pp. 437–438.) The injured employee ·sued the school district on the ground it

had failed to provide a safe place to work and recovered a judgment. After satisfying the judgment, the school district sued the maintenance company for indemnity. The appellate court found the evidence showed the maintenance company breached its contract with the school district when it failed to furnish stepladders to its window washers and failed to require the washers to use ladders while washing Hauser-type windows. (*Id.* at pp. 439–440.) In reviewing the language of the contract between the maintenance company and the school district the court stated, "Even if this did not amount to an express contract to indemnify the school district for damages caused to it by a breach of the contract by the maintenance company, such a warranty or agreement to indemnify would necessarily be implied." (*Id.* at p. 449.)

The court in *S. F. Unified Sch. Dist., supra,* 162 Cal.App.2d 434, 442, found persuasive authority for its conclusion in two United States Supreme Court cases, *Ryan Co. v. Pan-Atlantic Corp.* (1956) 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232] (*Ryan*) and *Weyerhaeuser S.S. Co. v. Nacirema Co.* (1958) 355 U.S. 563 [2 L.Ed.2d 491, 78 S.Ct. 438] (*Weyerhaeuser*). In both *Ryan* and *Weyerhaeuser* the United States Supreme Court held a shipowner could claim implied contractual indemnity against a stevedoring company whose employees had recovered a judgment against the shipowner for injuries sustained while unloading a ship. The cases held the stevedoring company could be liable for reimbursement to the shipowner where the injuries to the longshoreman resulted from the unsafe stowage of cargo (in *Ryan*) and an unsafe winch shelter erected by the stevedoring company (in *Weyerhaeuser*). (*Ryan, supra,* 350 U.S. at p. 125 [100 L.Ed. at pp. 137–138]; *Weyerhaeuser, supra,* 355 U.S. at p. 566 [2 L.Ed.2d at p. 493].) Citing to *Ryan* the Supreme Court in *Weyerhaeuser* stated that "[w]hile the stevedoring contract contained no express indemnity clause, it obligated respondent 'to faithfully furnish such stevedoring services as may be required,' and to provide all necessary labor and supervision for 'the proper and efficient conduct of the work.' As this Court said in *Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., supra,* such language constitutes 'a contractual undertaking to [perform] "with reasonable safety," ' 350 U.S., at 130, and to discharge 'foreseeable damages resulting to the shipowner from the contractor's improper performance.' 350 U.S., at 129, footnote 3." (*Weyerhaeuser, supra,* at p. 565 [2 L.Ed.2d at p. 493], fn. omitted.)

Following *S. F. Unified Sch. Dist., supra,* 162 Cal.App.2d 434, the First District Court of Appeal, in *Alisal Sanitary Dist. v. Kennedy* (1960) 180 Cal.App.2d 69 [4 Cal.Rptr. 379], concluded the plaintiff had stated a cause of action for indemnity where the complaint alleged in substance the plaintiff engaged the defendants to do engineering work for which the defendants represented themselves to be skilled specialists, that the work was negligently done, and such negligence caused personal injuries for which the plaintiff was obliged to pay damages. (*Id.* at p. 79.) The court stated, "The gist of the

complaint is the defendants' breach of its obligation to perform the engineering work in the skillful, expert, and careful manner they had represented they were capable of doing and the plaintiff's reliance on defendants' judgment and knowledge in matters in which the latter were experts. Such an obligation carries with it an implied agreement to indemnify and to discharge forseeable [*sic*] damages resulting to the plaintiff from the defendants' negligent performance." (*Ibid.*)

In *Montgomery Ward & Co. v. KPIX Westinghouse Broadcasting Co., supra*, 198 Cal.App.2d 759, the complaint alleged the defendant, pursuant to a contract, originated a telecast from the plaintiff's premises, had exclusive control and supervision over the technicians, employees and equipment involved in the telecast, and had negligently performed the accompanying duty and obligation to ensure the work was performed in a safe and careful manner, under appropriate supervision and in a safe place to work, which resulted in an employee of the defendant being injured while working on the telecast. The complaint alleged the injured employee had sued the plaintiff and that the plaintiff had entered into a reasonable settlement with the employee. The complaint sought indemnification from the defendant. (*Id.* at p. 760.) According to the appellate court, these allegations stated a cause of action for implied contractual indemnity, which "arises out of the relationship of the parties, their agreement, and the alleged negligent conduct on the part of the defendant." (*Id.* at p. 761.)

In *Great Western Furniture Co. v. Porter Corp.* (1965) 238 Cal.App.2d 502 [48 Cal.Rptr. 76] (*Great Western*), the plaintiff entered into a contract with the defendant to install, manage and supervise a "Thrift Club" in its stores. The defendant was to employ, manage and supervise the personnel. (*Id.* at p. 504.) One of the employees hired by the defendant assaulted a customer, who filed an action against the plaintiff and the defendant. (*Id.* at pp. 505–506.) Summary judgment was granted to the defendant. The plaintiff then settled with the customer and filed an action for declaratory relief and indemnity against defendant. (*Id.* at pp. 504, 506–507.) The appellate court affirmed the trial court's award of implied contractual indemnity based on the defendant's negligent management of its employee. (*Id.* at pp. 508, 521.) In the course of its discussion on appeal, the appellate court stated: "where the right of implied indemnity arises from a contractual relationship between the indemnitor and the indemnitee, it is predicated upon the indemnitor's breach of such contract, the rationale of the cases being that a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge forseeable [*sic*] damages resulting from improper performance absent any participation by the indemnitee in the wrongful act precluding recovery. [Citations.]" (*Id.* at p. 517.)

This brings us to *Bear Creek, supra,* 164 Cal.App.3d 1227, the case on which the trial court here placed its reliance for a negligence requirement for implied contractual indemnity. In *Bear Creek* the plaintiff homeowners association sought and obtained indemnification from the defendant title insurer for damages it sustained in a slander of title suit due to the defendant's failure to record covenants, conditions, and restrictions (CC & R's) on all lots in the subdivision. (*Id.* at pp. 1235–1236.) The trial court concluded the title insurer had breached its contractual obligation to timely record the CC & R's and awarded indemnity. (*Id.* at p. 1236.) Although this court reversed a portion of the judgment dealing with the award of interest and attorney fees, we otherwise affirmed the trial court's judgment. (*Id.* at pp. 1249–1250.)

■ Distinguishing the equitable indemnity doctrine applicable between joint tortfeasors from implied contractual indemnity, this court referred to the language of *Great Western* quoted *ante* and then stated (the language relied on the trial court here): "In short, implied contractual indemnity is based upon the premise that a contractual obligation to perform 'carries with it an implied agreement to indemnify and to discharge for[e]seeable . . . damages *resulting to the plaintiff* [indemnitee] from the defendants' [indemnitor's] negligent performance.'" (*Bear Creek, supra,* 164 Cal.App.3d at p. 1237, quoting *Alisal Sanitary Dist. v. Kennedy, supra,* 180 Cal.App.2d 69, 79, italics added in *Bear Creek.*) As additional authority this court cited a number of the cases we have just reviewed here. (*Bear Creek, supra,* at p. 1237, citing *Ryan, supra,* 350 U.S. 124, 129–132 [100 L.Ed. 133, 139–141]; *Weyerhaeuser, supra,* 355 U.S. 563, 565–567 [2 L.Ed.2d 491, 493–494]; *S. F. Unified Sch. Dist., supra,* 162 Cal.App.2d 434, 444–449; *Montgomery Ward & Co. v. KPIX Westinghouse Broadcasting Co., supra,* 198 Cal.App.2d 759, 762.) However, the opinion goes on to later emphasize, "An action for implied contractual indemnity is not a claim for contribution from a joint tortfeasor; it is not founded upon a tort or upon any duty which the indemnitor owes to the injured third party. It is grounded upon the indemnitor's breach of duty *owing to the indemnitee* to properly perform its contractual duties." (*Bear Creek, supra,* at pp. 1238–1239, original italics.) Of note, it does not appear from the *Bear Creek* opinion that the trial court made a finding the title insurer had been negligent in failing to record the CC & R's, only that it had breached the contract in failing to do so. The breach of contract was the trigger for the contractual indemnity, which this court affirmed. (*Id.* at pp. 1240–1241, 1250.)

We mention just a couple of other cases since *Bear Creek*.

In *West v. Superior Court, supra*, 27 Cal.App.4th 1625, buyers sued the sellers and real estate brokers who sold a damaged house to them. (*Id.* at pp. 1628–1629.) Sellers cross-complained against the brokers for equitable indemnity and implied contractual indemnity. The trial court dismissed the cross-complaint based on the statute of limitations and granted a motion for good faith settlement determination between the buyers and the brokers. (*Id.* at pp. 1629–1630.) The appellate court concluded the trial court erred and issued a writ of mandate vacating the trial court's order. (*Id.* at p. 1637.) Although the issues before the reviewing court were the statute of limitations and good faith settlement motion, it is interesting to note the court's discussion of the implied contractual indemnity cause of action. The appellate court discusses it in terms of the brokers' failure to "fully perform" or "properly perform" their contractual obligations and responsibilities in connection with the sale. There is no mention of negligent performance as a requirement. (*Id.* at pp. 1632–1633.)

The case of *Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp., supra*, 111 Cal.App.4th 1328, involved a cost overrun dispute regarding construction of a tunnel under the Pacific Ocean to discharge treated sewage into the sea. (*Id.* at p. 1331.) Ultimately the appellate court determined there could be no implied contractual indemnity in favor of the general contractor against the City of San Diego because the city had not breached their contract. (*Id.* at pp. 1345–1346, 1351.) However, it is again interesting that the court's summary of implied contractual indemnity states that the doctrine is based on the indemnitor's breach of contract, i.e., its failure to properly perform its contractual responsibilities. (*Id.* at p. 1351.) There is no mention of any negligence on the part of the alleged indemnitor.

In *Bay Development, supra*, 50 Cal.3d 1012, the California Supreme Court concluded implied contractual indemnity is a form of equitable indemnity, a claim of which is barred by a good faith settlement under Code of Civil Procedure section 877.6, subdivision (c). (*Bay Development, supra*, at pp. 1029–1033, 1035.) In a footnote the court observed the indemnity claim at issue rested on an alleged breach of an implied warranty in the contract for the sale of real property. (*Id.* at p. 1033, fn. 13.) The Supreme Court was not called upon, however, to discuss the nature of the alleged breach of such warranty, whether it was negligent or not.

As our review of the cases demonstrates, a duty to indemnify has been implied from the obligation of the contracting parties to perform their promises, the reasoning being that a promise to perform includes an implied promise to perform properly. Where the cases have factually involved a negligent failure to perform, it is not surprising the opinions contain language regarding the contracting party's implied obligation to "carefully" perform or

to perform with "reasonable care" or "reasonable safety." A negligent breach of contract is clearly sufficient to trigger implied contractual indemnity.[15] However, not all of the cases involving implied contractual indemnity include language of negligence. But in the cases where there does not appear necessarily to have been a negligent breach, the issue was not directly before the reviewing court. In fact, our review of the case law has disclosed no case, and the parties have not cited us to any case, in which a California court has been squarely presented with the issue of whether implied contractual indemnity requires a negligent breach of the contract.[16] We conclude it does not.

As many of the cases have recognized, implied contractual indemnity is not based on principles of tort law, but on the contractual relationship between the parties and a breach of the contract between them. (*Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp., supra*, 111 Cal.App.4th at p. 1351; *West v. Superior Court, supra*, 27 Cal.App.4th at p. 1633; *Bear Creek, supra*, 164 Cal.App.3d at pp. 1238–1239; *Great Western, supra*, 238 Cal.App.2d 502, 517; *Cahill Bros., Inc. v. Clementina Co., supra*, 208 Cal.App.2d 367, 379–380.) In fact, this court in *Bear Creek* stated, "Implied contract cases may involve joint tortfeasors, but it is not necessary that an indemnitor be jointly liable with the indemnitee for the third party's injuries to recover on an implied indemnity contract. *The court is concerned only with the obligations flowing between the indemnitor and the indemnitee, and whether the indemnitor breached an obligation which foreseeably resulted in the indemnitee being made liable for damages to the third party.*" (*Bear Creek, supra*, at p. 1240, italics added.) Implied contractual indemnity rests on a balancing of the equities of the contractual situation between the parties with "contracting parties sharing loss relative to their breach." (*Smoketree-Lake Murray, supra*, 234 Cal.App.3d at pp. 1736–1737.)

The equities of a contractual situation are not logically restricted to where there has been a negligent breach of contract. While the doctrine may have historically arisen from such situations, its conceptual basis is the idea of a contracting party's fair responsibility for foreseeable damages caused by its breach of the promises it made in the contract. We see no reason why this would not include responsibility for a breach of the implied warranty of

---

[15] The jury instruction language of Judicial Council of California Civil Jury Instructions (2006) CACI No. 3801 is appropriate for the situation where an indemnitee alleges a negligent breach of contract by the indemnitor. It should not be used, however, where a failure to use reasonable care by the indemnitor is not alleged by the indemnitee.

[16] Garlock has cited us to a federal decision, *La Fountain v. Sears, Roebuck and Co.* (E.D.Mich. 1988) 680 F.Supp. 251, affd. 872 F.2d 1026, as being directly on point. A review of the case, however, shows the award of indemnity was based on a right to common law indemnity under Michigan law. (*La Fountain v. Sears, Roebuck and Co., supra*, at p. 253.) The case is not authority for imposition of implied contractual indemnity in this case.

merchantability where such breach, even if not negligent, foreseeably causes damages to a third party for which another contracting party is held liable.

Moreover, as a form of equitable indemnity, it would appear inconsistent to limit implied contractual indemnity to situations involving a negligent breach of contract. The California Supreme Court has not so limited the comparative equitable indemnity doctrine. The Supreme Court has applied equitable indemnity not only to cover defendants whose negligence caused the plaintiff's loss (see, e.g., *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] (*American Motorcycle*), but to allow apportionment of loss between a strictly liable defendant and a negligent plaintiff (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162]), and between a defendant liable in strict liability and negligence and another defendant strictly liable (*Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322 [146 Cal.Rptr. 550, 579 P.2d 441]). Implied equitable indemnity is available based not only on negligence and strict liability but also in situations of vicarious liability. (*BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 852 [14 Cal.Rptr.3d 721].) Tortfeasors share loss in proportion to their culpability. (*American Motorcycle, supra*, 20 Cal.3d at pp. 595, 597–598; *Smoketree-Lake Murray, supra*, 234 Cal.App.3d at p. 1737.) Similarly, comparative equitable apportionment of loss under *American Motorcycle*, is applicable to a claim of implied contractual indemnity. (*Bay Development, supra*, 50 Cal.3d at p. 1029.) "Contracting parties shar[e] loss relative to their breach." (*Smoketree-Lake Murray, supra*, at p. 1737.)

We conclude the trial court erred in denying Garlock implied contractual indemnity based on Garlock's failure to prove Mao Shun's breach of warranty was the product of Mao Shun's failure to use reasonable care in performing its contractual duties. Garlock does not need to prove a negligent breach of contract to be entitled to implied contractual indemnity. We decline Garlock's request that we enter judgment in favor of Garlock awarding it indemnity for its settlement liability to Rockwell and attorney fees and costs. Instead, we shall remand the matter to the trial court for consideration of Garlock's claim of implied contractual indemnity.[17]

---

[17] Mao Shun claims four separate grounds for affirming the trial court's denial of the implied contractual indemnity claim. We have carefully considered each and find they are almost entirely based on factual and legal premises that we have already rejected elsewhere in this opinion. We note Garlock's settlement with Rockwell operated, at a minimum, to reduce and discharge a portion of Mao Shun's liability exposure to Rockwell. Rockwell could not recover twice for the damages it suffered from the defective oil seals should it proceed against Mao Shun. There is no serious question of the existence of a contract between Mao Shun and Garlock for the sale and purchase of those seals based on their course of dealing, the sample documentation, and the trial court's finding that Sunrise Trading was Mao Shun's agent. We need not repeat our discussion regarding Mao Shun's claims regarding Garlock's reliance on its own expertise, its failure to do functional testing, and Garlock's express warranties and

In light of such remand, we need not address Garlock's other claims of error in its appeal.

## DISPOSITION

The portion of the judgment denying Garlock's claim for implied contractual indemnity is reversed. In all other respects, the judgment is affirmed. Sunrise Trading shall recover its costs on appeal. (Cal. Rules of Court, rule 8.276.) Garlock shall recover its costs on appeal. (Cal. Rules of Court, rule 8.276.) The matter is remanded to the trial court with directions to consider Garlock's claim of implied contractual indemnity in light of the discussion in this opinion.

Raye, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied April 17, 2007, and the opinion was modified to read as printed above.

---

indemnification agreement in its contract with Rockwell. Moreover, to the extent there may be equitable reasons for the trial court to deny implied contractual indemnity to Garlock or to assess relative equities between Mao Shun and Garlock, these matters may be raised and argued in the trial court when it reconsiders this issue on remand. We do not express any opinion on the ultimate resolution of the issue, which we have left to the trial court.